547 A.2d 355

COMMONWEALTH of Pennsylvania, Appellee,

v.

Anthony GALLAGHER, Appellant.

Supreme Court of Pennsylvania.

Argued Dec. 11, 1987.

Reargued May 12, 1988.

Decided Aug. 31, 1988.

Seymore H. Johnson, Jr., Philadelphia, for appellant.

Ronald Eisenberg, Chief, Appeals Div., Laurie Magid, Asst. Dist. Attys., for appellee.

Leonard Sosnov, John W. Packel, Asst. Public Defenders, for amicus curiae Defenders Assn. of Phila.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This is an appeal from the order of Superior Court, affirming appellant's judgment of sentence for involuntary deviate sexual intercourse following a jury trial. The issue is whether the trial court properly permitted expert testimony regarding the victim's afflication with "rape trauma syndrome" (RTS). We hold that such testimony is inadmissible, and therefore vacate the judgment of sentence and remand for a new trial.

Uncontroverted evidence establishes that on November 26, 1977, an intruder gained entry to the home of the victim by posing as a police officer, then raped her and forced her to submit to other sexual outrages. The victim described the assailant to the police and reported that he identified himself as Gallagher. Two weeks later, on December 10, 1977, the victim examined a photographic display containing the appellant's picture and also faced him in a voluntary

one-on-one confrontation; in neither instance did she identify him.

More than four years later, however, the victim identified the appellant from a photographic display. The appellant was then arrested on February 19, 1982, and charged with rape and numerous related offenses. Prior to his arrest, however, the statute of limitations had expired on all the offenses except involuntary deviate sexual intercourse. Accordingly, he was tried only for the latter offense.

At his jury trial, the appellant contested his identification as the rapist. In order to downplay the victim's repeated failures to identify appellant within weeks of the crimes and bolster her identification after four years, the Commonwealth presented Ann Burgess as an expert witness with respect to RTS. Burgess holds a master's degree in psychiatric nursing and a doctorate in nursing science. Together with a colleague, Professor Lynda Holmstrom of Boston College, Burgess co-authored an article in the American Journal of Psychiatry which is credited with being the first study of victims of sexual attack to use the term "rape trauma syndrome." [1] Burgess's qualifications included extensive teaching, research, writing, and forensic experience with the psychological effects found in rape victims. She described the symptomology of the syndrome, now accepted as a standard post-traumatic stress response disorder by the American Psychiatric Association. She then summarized her examination of the victim, stated her diagnosis that the victim suffered from RTS, and related her opinion of how the phenomena of RTS bore upon the identification process.

The appellant was convicted by jury, his post-verdict motions were denied, and he was sentenced to serve ten to twenty years imprisonment. On appeal, a divided panel of the Superior Court affirmed the judgment of sentence. The primary issue is whether Burgess's testimony regarding RTS was admissible. We hold that the testimony was an

1. Burgess and Holmstrom, *Rape Trauma Syndrome,* 131 AM.J. PSYCHIATRY 981 (1974).

impermissible encroachment on the jury's function of determining credibility, and reverse the judgment of sentence.

At the appellant's trial, there was no question that the victim had been sexually assaulted; the principal question for the jury was the identity of the attacker. The victim's positive, indeed animated,[2] identification of the appellant at trial was seriously undermined by the fact that she had been unable to identify him two weeks after the crime. The testimony of Burgess regarding RTS was introduced for the sole purpose of shoring up the credibility of the victim on the crucial issue of identification.

Determinations of credibility, however, are exclusively the province of the jury. *Commonwealth v. Seese*, 512 Pa. 439, 443, 517 A.2d 920, 922 (1986). We have consistently rejected expert testimony which encroaches on this vital jury question. *Kozak v. Struth*, 515 Pa. 554, 531 A.2d 420 (1987) (prohibiting expert testimony on causation and due care because issues of ultimate fact, especially those of

2. The victim's testimony was punctuated by repeated outbursts such as the following:

There he is, he's the one. He wanted to be caught. He knew he was getting caught. He wanted to get caught. And there he is, caught, Tony Gallagher.

. . . .

And he got away that day. And I knew it was him. And that's why I have chased him, Tony Gallagher, for five years because I knew that he pulled that off on the cops. I knew the cops didn't know him. I knew him.

He was too sneaky, too devious. The cops weren't on to him. I knew him, they didn't know him—

. . . .

[I]t just sets me crazy to see him walking, to know that he did this to me, that he got away with it, because he is devious, sneaky and lying, and I am not lying.

He is the one. He knows he is the one. And I know he's the one. But the cops didn't know it because they don't know him the way I know him.

. . . .

Q Now are you positive that the man you have identified today in this courtroom is the man that sexually assaulted you November 26, 1977?

A I am very positive.

He knows it, I know it.

Before this is over, every one of you will know it, every one of you will know it the way I know it.

credibility, are for jury, not expert); *Commonwealth v. Seese, supra* (prohibiting expert medical testimony regarding the veracity of children who claim to be objects of sexual abuse); *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976) (prohibiting expert testimony of clinical psychologist to substantiate and corroborate the defendant's version of the critical events). We must examine the testimony of Burgess in light of this standard.

Burgess first described RTS as occurring in two phases. The first is the acute phase, lasting days or weeks, during which the victim is emotionally overwhelmed and has difficulty performing ordinary functions; this is followed by a long term reorganization phase, lasting months or years, during which the victim deals with symptoms specific to the rape which must be integrated into the victim's psychological experience to enable her to function at a precrisis level. Burgess then elaborated on how these symptoms could affect the victim's ability to identify the rapist:

Q And, what about the phobia about repetition of seeing the face? Could you describe that and explain that to us?

A The—right. She had an opportunity to see the assailant's face, and, so, that imprinted, if you will, in her mind, and that is a flashback. That keeps coming back.

In fact, right after the assault, she described how this would happen, where suddenly thinking she saw someone, again a common reaction that she also had, feeling that he is everywhere, because the assault was still so new, still so fresh.

Q How is that integrated, that phobia?

A ....

It's a gradual process.

Q Is a five-year time period a telling time period for this gradual integration process?

A Our study of our victims showed four to six years later we had still twenty-five percent that were still very symptomatic. We had others, of course, who had recovered, but five years you still have a very—in certain areas you can have specific symptoms in the phobic area, be-

cause that's more or less the definition of a phobia. It wards off into a particular area of symptoms.

Q And, would that account for her flood of emotions still to this day about the material?

A Yes. What seems to happen in the research we have been looking at is traumatic events are what is called actively stored in the mind, and when a certain, if you will, button is pressed: i.e., seeing someone, or whatever, all of that emotion and everything can just come flooding back, and that's the phenomenon of a flashback out of the past.

An event comes back, because there has been some triggering in the environment that the person is in, and it just kind of brings it all back.

Q By bringing it all back, does it also bring the phase back of the original assailant? Is that the kind of thing that would flash right back before your eyes?

A Oh, yes.

MR. STANSHINE [Defense counsel]: Objection.

THE COURT: Overruled.

BY MS. FLEISHMAN [Prosecutor]:

Q And, could you describe in terms of a heart attack, so that we can understand what that flashback might feel like, could you draw an analogy to a heart attack?

A Yes. We are doing a study now of men who have had heart attacks, and a heart attack is another confrontation with death, and many men feel they are going to die when they have a heart attack.

. . . .

He had had symptoms not only of pain, but of nausea, so you have two linking, if you will, phenomena that in his mind—if you want to think of the mind like a computer button—was pressed, and the image came back.

Q Did you find that symptom to be true of that flood or flashback symptom in [the victim]?

A Yes, I did.

The crux of the testimony appears to be that the victim's failure to identify the appellant two weeks after the rape is unremarkable, as she was in the acute phase of RTS in which a victim has difficulty performing even normal functions, and the in-court identification five years later is particularly credible, as it results from a flashback, with the mind operating like a computer. It is clear that the only purpose of the expert testimony was to *enhance the credibility* of the victim.

We stated in *Seese, supra:*

> The question of whether a particular witness is testifying in a truthful manner is one that must be answered in reliance upon inferences drawn from the ordinary experiences of life and common knowledge as to the natural tendencies of human nature, as well as upon observations of the demeanor and character of the witness.... [T]he question of a witness' credibility has routinely been reserved *exclusively* for the jury.

512 Pa. at 443, 517 A.2d at 922 (citations omitted; emphasis added). Such testimony would invest the opinions of experts with an unwarranted appearance of authority on the subject of credibility, which is within the facility of the ordinary juror to assess.[3]

We therefore hold that expert testimony on rape trauma syndrome should not have been admitted in the trial of this case. Accordingly, we reverse the order of Superior Court and remand for a new trial.

Order reversed and case remanded.

LARSEN, J., files a dissenting opinion.

PAPADAKOS, J., files a dissenting opinion which is joined by NIX, C.J.

***

3. We need not reach the appellant's argument that RTS is not sufficiently reliable to be admissible as it has not been widely enough accepted by the scientific community, nor the additional argument that RTS has developed as a therapeutic tool for the treatment of stress-related symptoms, *not* as a forensic tool to ascertain facts which might be useful to a jury.

298

LARSEN, Justice, dissenting.

I dissent.

The issue presented by this appeal is whether the trial court erred in permitting an expert to testify about rape trauma syndrome as it relates to a sexual assault victim's ability to identify her attacker.

The victim in this case is a schoolteacher who was in her late forties at the time of the incident in question. She had formerly been a nun living in a convent for over twenty-five years, but she was living alone in northeast Philadelphia on the night of November 26, 1977. At approximately 2:20 a.m., appellant, Anthony Gallagher, posing as a police officer, gained entrance to the victim's home by means of a ruse. The victim became suspicious when she smelled alcohol on appellant's breath, and, when she challenged him, he grabbed her and began his terrorizing assault. First choking and threatening the victim, appellant raped the victim and then forced her to remove her night clothes. When she knelt to pray, appellant forced the victim to perform oral sex. The assault continued for thirty to forty minutes.

The victim reported the attack to the police and described her assailant as one of the men who had been in her home earlier that year to give her an estimate on installing glass box windows. At that time, appellant had identified himself as Anthony Gallagher and had claimed to be "with the police." Two weeks after the rape, the victim was shown a photographic display containing appellant's picture, and she was given the opportunity to see him in person at the police station. The victim testified that she could not look at appellant, even though she was in the safety of the police station, and that all she wanted to do was to get away from appellant. The face-to-face confrontation was not conducted as a formal line-up. The victim viewed appellant across a police captain's desk. The victim told the police at that time that appellant looked, acted and talked like her attacker, but that his hair and mustache were not the same as her

attacker's. The victim did not make a positive identification.

Immediately following the attack and during subsequent years, the victim exhibited the phobic and obsessive behavior commonly experienced by rape victims. For example, she thought she saw her attacker everywhere, she slept fully dressed, and she circled the block carefully before entering her home. Anxious to see her assailant apprehended, the victim remained in contact with the police. Over four years after the attack and following a similar attack on another victim, the police again presented the victim with a photographic display. The victim made a positive identification of appellant at this time.

Appellant was arrested in February of 1982, and was tried for involuntary deviate sexual intercourse. The statute of limitations had expired on all other related charges. During appellant's trial before a jury in the Court of Common Pleas of Philadelphia County, the trial court, over objection, permitted Dr. Ann Burgess [1] to testify about rape trauma syndrome and how it would relate to the victim's ability to identify her attacker. The defense in the case was misidentification. Dr. Burgess offered no opinion or comment as to the victim's truthfulness or the accuracy of her identification. Nor did Dr. Burgess discuss the particular circumstances of the failed or successful identifications made by the victim. Dr. Burgess did testify that rape victims are generally subject to phobias immediately after an attack and will seek to avoid anything in their environment that will remind them of the attack. In the opinion of Dr. Burgess, the victim in the instant action was suffering from rape trauma syndrome.

Appellant was found guilty and, following the denial of his post-trial motions, appellant was sentenced to serve a ten to twenty year term of imprisonment. This sentence

1. Dr. Burgess, a nurse with a master's degree in psychiatric nursing and a doctorate in nursing science, co-authored an article in 1974 which first identified and labelled rape trauma syndrome. Burgess and Holmstrom, Rape Trauma Syndrome, 131 J. Psychiatry 981 (1974).

was to run consecutively to other sentences being served by appellant. Appellant had previously been convicted of perjury and impersonating a police officer. He had also been convicted of rape and had been sentenced to a seven and one-half to twenty-three year term of imprisonment. As in the case now before the Court, appellant had also used a ruse late at night to enter the home of an older, unmarried schoolteacher who also lived alone in northeast Philadelphia.

On appeal of the within case, a divided panel of Superior Court affirmed, finding that the trial court properly admitted the expert testimony in that "this testimony did not invade the province of the jury by impermissibly bolstering the complainant's credibility." 353 Pa.Super. 426, 444, 510 A.2d 735, 744 (1986). I agree and would affirm the order of Superior Court.

Trial courts have broad discretion with regard to evidentiary questions and will not be reversed in the absence of a clear abuse of discretion. *Commonwealth v. Cargo*, 498 Pa. 5, 444 A.2d 639 (1982). Expert testimony is permitted as an aid to the jury where the subject is beyond the knowledge or experience of the average layman. *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976). The average juror does not know about the psychological and behavioral impact of rape on a rape victim. Indeed, many jurors bring to the courtroom the myths about rape which had long influenced our courts as they applied "special" rules of evidence only to rape cases. *See Matter of Pittsburgh Action Against Rape*, 494 Pa. 15, 428 A.2d 126 (1981) (Larsen, J., dissenting).

I agree that an expert witness may not testify to the truthfulness of a witness without impermissibly invading the province of the jury. *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986) (Larsen, J., concurring). Dr. Burgess, however, did not testify to the truthfulness of the victim. Dr. Burgess described rape trauma syndrome, a posttraumatic stress disorder recognized by the American Psychiatric Association, and explained that the phobias and

behavioral changes experienced by rape victims can influence their ability to identify their attackers. Clearly, this information was beyond the ordinary training, knowledge, intelligence and experience of the ordinary juror and assisted the jury in assessing the testimony of the victim who had accounted for her inability to make a positive identification two weeks after she was raped.

Dr. Burgess did *not* state that "the [victim's] in-court identification five years later is particularly credible, as it results from a flashback, with the mind operating like a computer." Maj. op. at 358. With reference to the expert testimony quoted by the majority, it is clear that Dr. Burgess was explaining to the jury why the victim was still subject to a "flood of emotions" when something in the victim's environment triggered a flashback. The environmental stimulus responsible for such a flashback would, of course, include the presence of the attacker. Dr. Burgess did not say, however, that *only* the attacker could trigger a flashback. In fact, the victim testified that she was frequently subjected to overwhelming emotional flashbacks when she saw people who *reminded* her of appellant. Notes of Testimony at 4.60 (March 3, 1983).

The courts in other jurisdictions have permitted expert testimony that relates to the ability of a sexual assault victim to perceive, recall or relate. *See, e.g., State v. Staples,* 120 N.H. 278, 415 A.2d 320 (1980); *State v. Harwood,* 45 Or.App. 931, 609 P.2d 1312 (1980). As noted by Mr. Justice Papadakos in his dissenting opinion hereto, Superior Court has upheld the admissibility of such testimony in *Commonwealth v. Baldwin,* 348 Pa.Super. 368, 502 A.2d 253 (1985), particularly where the expert testimony is introduced in cases involving sexual assault.

Accordingly, I would affirm the order of Superior Court, affirming the judgment of sentence.

PAPADAKOS, Justice, dissenting.

I dissent on two grounds. First, I believe the majority's analysis of our own precedents to be erroneous. Second,

the majority has overlooked the existence of a recent Superior Court case directly on point which is contra to the proposed disposition of this case.

The majority correctly cites our decision in *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986), for the rule that an expert cannot characterize a witness in such a way as to speak to the issue of witness credibility which is exclusively the province of the jury. In *Seese*, the expert's profile testimony was inadmissible because it stated with scientific certainty that the witness was telling the truth as to the facts of that case. *Seese*, therefore, sharply focuses on the specific problem of whether to permit an expert who is profiling a witness to testify that the witness is not lying. In this particular context, *Seese* was decided correctly by this Court.

Profile evidence of an expert, nevertheless, has been used extensively by other jurisdictions for a different purpose of aiding the factfinder in understanding the behavioral or psychological characteristics of crime victims. Courts have admitted such expert evidence especially in various sexual crimes where, on the one hand, it is presumed that the average layman lacks knowledge of how such victims react and, on the other, where victims of sexual abuse have difficulty remembering dates and other facts. See, for example, *State v. Pettit*, 66 Or.App. 575, 675 P.2d 183 (1984); *State v. Middleton*, 294 Or. 427, 657 P.2d 1215 (1983); and *Smith v. State*, 100 Nev. 570, 688 P.2d 326 (1984). As to rape trauma syndrome in particular, numerous courts also have admitted profile evidence for the limited purpose of aiding the jury. See the extensive citations and bibliography collected in McCormick on Evidence § 206 (E. Cleary ed. 3rd ed. 1987) and Annot., 42 A.L.R.4th 879. McCord, *The Admissibility of Expert Testimony Regarding Rape Trauma Syndrome in Rape Prosecutions*, 26 B.C.L.Rev. 1143, 1177–78 (1985), concludes that "there is unanimous agreement among the courts which have considered the issue that rape trauma syndrome testimony (and child sexual abuse testimony) is properly admis-

sible to explain what might otherwise seem to be unusual complainant behavior." *Seese* properly excluded such evidence because it ran to the issue of telling the truth. Also see, e.g., *Hall v. State*, 15 Ark.App. 309, 692 S.W.2d 769 (1985), and *Duley v. State*, 56 Md.App.275, 281, 467 A.2d 776, 779 (1983). At the same time, however, there is no reason to disallow the use of profile evidence to help the jury understand the various and seemingly unexplainable reactions of crime victims. *State v. Petrick*, 101 Wash.2d 566, 683 P.2d 173 (1984).

The Superior Court recently ruled on this specific issue in *Commonwealth v. Baldwin*, 348 Pa.Superior Ct. 368, 502 A.2d 253 (1985).[1] In that case, a social worker was allowed to testify to the effects of an incestuous relationship on the victim and "the psychological forces which cause the victim to keep the incest a secret for a long time, and why victims are often unable to recall exact dates or times or describe specific incidents in detail."

Relevant portions of Judge Beck's opinion are as follows:

The courts of several other jurisdictions have considered the issue, though, and have held that expert testimony regarding the behavior patterns of child sexual abuse victims was properly admitted. *See, e.g., People v. Dunnahoo*, 152 Cal.App.3d 561, 199 Cal.Rptr. 796 (1984); *State v. Kim*, 64 Haw. 598, 645 P.2d 1330 (1982); *State v. Middleton*, 294 Or. 427, 657 P.2d 1215 (1983); *State v. Haseltine*, 120 Wis.2d 92, 352 N.W.2d 673 (1984). Other courts have admitted similar expert testimony on "rape trauma syndrome" to assist the jury in understanding the dynamics of rape; *see, e.g., State v. Marks*, 231 Kan. 645, 647 P.2d 1292 (1982); *State v. Staples*, 120 N.H. 278, 415 A.2d 320 (1980). *See also State v. Conlogue*, 474 A.2d 167 (Me.1984) (expert testimony on "battered child syndrome" and patterns of child abuse within family admissible to impeach credibility of mother's retraction of confession that she had abused her child); *State v. Kelly*, 97

1. Allocatur was denied by this Court on September 17, 1986.

N.J. 178, 478 A.2d 364 (1984) ("battered woman syndrome" proper subject for expert testimony where issue was whether defendant wife could establish claim of self-defense in prosecution for killing husband).

(4) The foregoing decisions support our conclusion that expert testimony such as that offered by Battinieri does not improperly invade the jury's prerogative.

\* \* \* \* \* \*

We also hold that the behavioral and psychological characteristics of child sexual abuse victims are proper subjects for expert testimony.

\* \* \* \* \* \*

Courts and commentators alike have observed that for these reasons child sexual abuse victims often have difficulty remembering dates and times or describing details of sexual acts, and are reluctant witnesses, sometimes refusing to testify or recanting prior allegations out of fear or coercion.

*Id.*, 348 Pa.Superior Ct. at 375–378, 502 A.2d at 256–258.

It is to be noted, of course, that Judge Beck specifically included rape trauma syndrome as part of the "foregoing decisions" which formed the basis of her argument. We now have appellate court precedent on the subject. We should acknowledge its existence and give serious consideration to the rationale which supports such precedent before overruling it.

I conclude that the testimony in this case more accurately fits within the *Baldwin* analysis rather than under *Seese*. Finally, while I believe that we should retain a healthy skepticism regarding the value of such expert testimony, the majority opinion would lead inevitably to a situation where all psychological evidence would be barred. Opinion evidence certainly cannot usurp the function of the jury where it touches the very issue before the jury, but I believe that a fundamental difference exists where the

evidence constructs a diagnostic or behavioral profile which provides background information for the trier of fact.

NIX, C.J., joins in this dissenting opinion.