92 A.3d 753

COMMONWEALTH of Pennsylvania, Appellant

v.

Jose ALICIA, Appellee.

Supreme Court of Pennsylvania.

Argued Sept. 11, 2012.

Decided May 28, 2014.

430

Hugh J. Burns Jr., Esq., Peter Carr, Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

Lawrence Samuel Krasner, Esq., Lloyd Everett Long III, Esq., Krasner, Hughes & Long, LLC, Philadelphia, for Jose Alicia.

Bruce Philip Merenstein, Esq., Hans Justin Park, Esq., Julie Elizabeth Randolph, Esq., Schnader Harrison Segal & Lewis, L.L.P., Philadelphia, for The Innocence Network and The Pennsylvania Innocence Project.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, MCCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice McCAFFERY.

The Commonwealth appeals from the order of the Superior Court that affirmed the pre-trial order of the court of common pleas permitting Jose Alicia ("Appellee") to introduce expert

testimony concerning the phenomenon of "false confessions" at his upcoming murder trial. Because we agree with the Commonwealth that such testimony is not admissible, we reverse the order of the Superior Court and remand this matter to the court of common pleas.

On November 1, 2005, Appellee was arrested and charged with murder and related offenses in the shooting death, two days earlier, of one George Rowe at the Blue Mountain Café in Philadelphia. Evidence adduced at the pre-trial stage established that Appellee and several of his friends, including Lydia Rivera, Jeremy Duffy ("J.P."), and Angel Ortiz, had gone to the café after receiving word that individuals who had previously robbed Ortiz were there. In the midst of the physical altercation that ensued between the two groups, a gun was fired, hitting the victim, an innocent bystander who was not part of either group.

Appellee was detained by police and questioned over a period of approximately six hours. Although Appellee initially denied involvement, near the end of the interview he confessed to shooting the victim during the altercation in the café,[1] and

---

1. The relevant portions of Appellee's statement to the police are as follows:

Q. Are you willing to answer questions of your own free will regarding this shooting inside 5514 Rising Sun Avenue?
A. Yes.
Q. Do you know the decedent in this matter, George Rowe?
A. No.
Q. Were you present inside the Blue Mountain Café when a male was shot and killed on 10–30–05 at about 8:23 pm?
A. Yes.
Q. Do you know who shot the male inside the Blue Mountain Café on 10–30–05 at about 8:23 pm?
A. I did.
Q. Jose, who else was present when you shot the male inside the Blue Mountain Café?
A. Tito, JP, Angel and Lydia.
Q. Jose, would you tell us what took place that led up to you shooting the male inside the Blue Mountain Café?
A. We were hanging out down at 3rd and Indy; Me, Tito and JP when Lydia calls Tito on his cell phone. She was like, "they rolled on Angel" and she was gonna pick us up to go over there. We were all like "OK", we were all in agreement. We were getting rowdy, ready to fight. After a couple of minutes, Lydia pulls up and picks us

up. We get in the car and she drives us to the corner of Clarkson and Westford. We got out there and waited for her. She was going to go up and pick up Angel so that he could take us to where the guys that rolled on him were. Then Angel and Lydia came walking back. We followed them around the corner to the café on Rising Sun Ave. where all this happened. When we got to the café, Angel peeped in the window to make sure that the guys were in there. Angel says they are in there so we go in. Angel went in first then everyone else. I went in last and stayed by the door. Everybody just started fighting, tables and chairs started flying. I started to back up and as I did that, I pulled a gun out of my waist. I pointed it at the guys and told them to stop throwing chairs. The guy threw another chair and the gun went off. Everybody started running; one guy was trying to run to the back door and I fired two shots at the door while he was running. After that I ran out of the place. I ran to my right and up Clarkson. As I was running, I heard someone say "drop the weapon". I thought it was the Police, so I dropped the gun and kept running. Then I just went home.

Q. What kind of gun did you have?
A. It was a silver automatic, that's all I know.
Q. At what point did you get your gun that day?
A. I had it with me that night but not on me. I didn't actually keep it on me until Lydia came.
Q. Did Lydia tell you how many people "rolled on" Angel?
A. I think she said three.
Q. Did she tell you who rolled on Angel?
A. She just said that they were black guys who wanted to take his money.
Q. When you went into the Blue Mountain Café, how many guys were in there?
A. There were three of them.
Q. Did you know any of these males?
A. No, I never saw them before.
Q. Did anyone else have a gun that night in the café?
A. I didn't no [sic].
Q. Jose Det. Burns is showing you a number of photographs. Can you tell me if you recognize these males? A. Yeah. This is JP (identifying ... Jeremy Duffy); this is Angel (identifying ... Angel Ortiz) and this is Tito (identifying ... Andres Rivera).
Q. Are these the same males that were with you the night that you shot the male inside the Blue Mountain Café at 5514 Rising Sun Ave.?
A. Yes.
Q. Det. Burns is showing you a Driver's License photograph, do you recognize this female?
A. Yes. That's Lydia (identifying ... Lydia Rivera).
Q. Is this the Lydia that you have been referring to in your statement?
A. Yes.
Q. Jose, is there anything else that you would like to add?
A. Just that I didn't mean to kill anyone. I was really feared [sic] of the guys throwing chairs at me so I fired so I can get out of this tradity [sic].

he subsequently was charged with murder, criminal conspiracy, possession of an instrument of crime, and two violations of the Uniform Firearms Act.[2] The Commonwealth's evidence against Appellee included a statement from Lydia Rivera[3] that Appellee was the shooter. However, other eyewitnesses identified the shooter as Angel Ortiz, and Ortiz told police that Jeremy Duffy was the shooter.

On May 3, 2007, Appellee filed a Motion for Use of a False Confessions Expert, averring the following. Appellee is of low intelligence and has been an SSI disability beneficiary due to mental health issues most of his life.[4] The only evidence identifying Appellee as the shooter (other than his confession) comes from two corrupt sources, one of whom initially stated that the shooter was Jeremy Duffy. Appellee believes Duffy was the shooter, and that the evidence at trial will show that Appellee was told by Duffy's associates to "take the fall for the real perpetrator." Motion for Use of a False Confessions Expert, dated 5/3/07, at ¶¶ 4–6. According to this Motion, the text of Appellee's confession, along with his handwritten corrections, "provide a number of clues indicating it is a false confession." *Id.* at ¶ 7. Further, the Motion avers that although "jurors find it impossible to believe that a person would make a false confession," it has been proven in over 185 cases that false confessions do indeed occur. *Id.* at ¶ 9. Based on the above averments, Appellee requested that the court grant his motion to permit a false confessions expert to testify.[5]

> Q. Jose, I would like for you to read this 5 page statement. You can make corrections or additions. If it is true and correct sign the bottom of each page.
> A. Ok Jose Alicia from the bottom of my heart that I'm sorry for all that I have done.
> Investigation Interview Record, dated 11/01/05.

2. Respectively, 18 Pa.C.S. §§ 2502, 903, 907, 6106, and 6108.

3. Ms. Rivera is identified variously as Appellee's friend or as his aunt.

4. A defense mental health expert concluded that Appellee's IQ score was 64, placing him in the range considered mentally retarded. *See* Psychological Evaluation by Allan Tepper, J.D., Psy.D., dated 3/19/07, at 4.

5. Appellee's motion of May 3, 2007, did not request a specific expert, but rather stated that the defense was then "currently corresponding

On June 6, 2007, the Commonwealth filed a motion to exclude any defense expert on false confessions. The Commonwealth noted that Appellee, in his motion for such an expert, did not allege that the police had influenced or coerced him to give a false confession. Commonwealth's Motion to Exclude Defense Expert in False Confession and for a *Frye* Hearing on the Admissibility of Said Expert,[6] filed 6/6/07, at ¶¶ 3, 12. The Commonwealth averred that the determination of whether an individual falsely confessed to a crime is within the jury's own ability to evaluate. In addition, the Commonwealth argued that expert testimony regarding the phenomenon of false confessions in general, proffered in order to give rise to the inference that Appellee's confession must also be false, would undermine the fact-determining process because such testimony would be based on mere speculation. *Id.* at ¶ 12. Accordingly, the Commonwealth asked the court to deny Appellee's motion as not relevant because the jury was capable of assessing whether the evidence established that non-police sources might have influenced Appellee to confess falsely.

On June 17, 2008, the court of common pleas held a hearing to determine whether the proposed testimony of Richard Leo, Ph.D., J.D., Appellee's proffered expert in the area of police interrogation practices, psychological coercion, and false confessions, was admissible. Notes of Testimony ("N.T."), 6/17/08, at 11. The court first found that Dr. Leo was "qualified as an expert in the field of police interrogations." [7]

with two of the nation's three most prominent and respected false confessions experts: Richard A. Leo ... and Alan Hirsch" and attached a *curriculum vitae* for each of the two individuals. Motion for Use of a False Confessions Expert, dated 5/3/07, at ¶ 10. Appellee subsequently proffered the testimony of Dr. Leo.

6. As indicated in the title of its motion, the Commonwealth also sought a *Frye* hearing on the admissibility of the defense expert's testimony concerning false confessions. *See Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). The issue of the admissibility of the proffered testimony under *Frye* is not before us.

7. As developed at the hearing, Dr. Leo received a Ph.D. and a J.D. in 1994 from the University of California at Berkeley. Notes of Testimony ("N.T."), 6/17/08, at 19, 21. His doctoral dissertation was "on the study of police interrogation practices in the United States in the 20th

*Id.* at 34. Dr. Leo then explained police interrogation as a two-step psychological process: the first step is to convince the suspect that he or she is caught and denial is futile, and the second step is to motivate the suspect to believe that it is in his or her best interest to make a full confession. *Id.* at 45–46. Dr. Leo testified that there are two different types of false confessions that may result from police interrogation: 1) a "compliant" false confession in which a suspect is psychologically coerced to lie, knowingly giving a false confession in order to end the interrogation and perhaps to be treated more leniently; and 2) a "persuaded" or "internalized" false confession in which a suspect confesses to a crime under the belief that he or she did in fact commit the crime although he or she has no memory of doing so.[8] N.T., 6/17/08, at 50–52.

When asked what he would testify to, were he permitted to testify in Appellee's case, Dr. Leo responded as follows. First, in general terms, he would educate the jury as to police interrogation methods, psychological research on interrogation methods, and coercive interrogation methods that can put an innocent suspect at risk of making a false confession. *Id.* at 59–64. Second, in terms of the specifics of this case, Dr. Leo would discuss the specific interrogation techniques he discerned from interviewing Appellee about what took place during his interrogation, and identify any possible risks of false confession posed by those techniques. In addition, Dr. Leo would discuss the relevance of Appellee's low IQ to the risk of false confession. *Id.* at 61–62.[9] At the end of the

century." *Id.* at 19. Subsequently, he has been a professor at three universities in four departments, to wit, psychology, criminology, sociology, and law. *Id.* The primary focus of his research has been "police interrogation, *Miranda*, false confession, and wrongful conviction." *Id.* at 19–20.

8. Of these two types of false confessions, the latter is rarer and is not a basis upon which Appellee here challenges the veracity of his statements to police.

9. Dr. Leo also submitted a report to the court in which he stated that if called to testify at Appellee's trial, he would provide the following testimony: "I would provide general educative testimony about modern American interrogation techniques and strategies; the step-by-step process through [sic] psychological interrogation is designed to move the suspect from denial to admission; the assumptions, goals and effects of

hearing, the trial court ordered the parties to submit memos on the admissibility of Dr. Leo's proffered trial testimony.

On August 12, 2008, the court issued the following order, which permitted Dr. Leo to testify in general regarding police interrogation techniques, but barred him from giving testimony as to any specific allegations in Appellee's case:

1. Dr. Leo may testify, based on his knowledge, his own research and the research of others with which he is familiar, about the general concept of false confessions.

2. Dr. Leo may further testify, again based on his knowledge, his own research and the research of others with which he is familiar, about:

(a). Police training methods in the field of interrogations;

(b). Police interrogation methods; and

(c). Why certain interrogation techniques, if used in a particular case, may increase the risk of false confession.

3. Dr. Leo may *not* testify as to case specific allegations about the interrogation in the instant case, and may *not* offer testimony based on:

(a). Statements provided to him by the defendant either verbally or in writing;

(b). Documents or reports prepared by counsel or other experts, to the extent such documents or reports purport

police interrogation practices; which interrogation methods and strategies researchers regard as psychologically coercive and why; how and why psychologically coercive police interrogation techniques can lead the innocent to confess falsely; what we know about the phenomenon of interrogation-induced false confession; the personal and situational risk factors for interrogation-induced false confession; and the patterns, characteristics and indicia of unreliability found in interrogation-induced false confessions."

Leo Report, dated 5/15/08, at 4–5.

Dr. Leo also indicated that he had interviewed Appellee, who had stated that his family had put pressure on him not to snitch on "Jay–Jay" as the shooter, and he feared that he and/or his family would be harmed were he to do so. *Id.* at 6–7. Dr. Leo acknowledged that "[o]ther than the participants, no one knows what really happened during [Appellee's] interrogation." *Id.* at 6.

to be based on discussions with or information about the defendant, Jose Alicea;

(c). What he believes may be factors specific to this interrogation that may have given rise to a false confession; and

(d). Whether or not he believes the confession in this case was voluntary or coerced, or true or false.

Trial Court Order, entered 8/12/08 (emphases in original).

The Commonwealth filed an interlocutory appeal in the Superior Court, arguing that the trial court had erred in ordering that Dr. Leo could testify, because his proffered testimony would invade the credibility-assessing function of the jury.[10] In an opinion filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), the trial court reasoned that, because Dr. Leo would not be permitted to testify "as to any case specific allegations with regard to [Appellee's] confession or the interrogation methods used by police in this particular case" and would not be permitted to offer opinion testimony as to the truthfulness of Appellee's confession, the jury would remain the ultimate arbiter of the credibility of Appellee's confession. Trial Court Opinion, dated 11 /24/08, at 6.

A divided panel of the Superior Court affirmed the order of the trial court. The lead memorandum opinion written by Judge Mary Jane Bowes held that Dr. Leo's proposed testimony would not usurp the jury's credibility-determining function and would not improperly bolster or attack the credibility of, respectively, Appellee or law enforcement officers, because the court had barred Dr. Leo from discussing the specific circumstances of Appellee's interrogation and confession. *Commonwealth v. Alicia,* 2445 EDA 2008, slip opinion at 36–37, 45, 26

10. The Commonwealth also argued that Dr. Leo's methodology was not generally accepted in the relevant scientific community, and, therefore did not meet the admissibility requirements of *Frye v. U.S.,* 293 F. 1013 (D.C.Cir.1923) and *Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 839 A.2d 1038 (2003). However, we did not grant review of this issue and we shall not address it further. For this reason, certain of the cases from other jurisdictions excluding expert testimony regarding false confessions relied upon by the Commonwealth are inapposite as they directly address whether the expert testimony proffered is based on any reliable and accepted scientific methodology.

A.3d 1190 (Pa.Super., filed 3/14/11) (memorandum opinion). In a concurring statement, President Judge Emeritus Stephen McEwen set forth his view that Dr. Leo's testimony was not relevant to the issues before the jury; however, because the Commonwealth had not raised the issue of relevance before the Superior Court, he remained in a concurring posture. *Alicia, supra* (McEwen, P.J.E., concurring, at 2). In a dissenting memorandum, then-President Judge Correale Stevens concluded that Dr. Leo's testimony would impermissibly invade the jury's exclusive role as the arbiter of credibility because even a general discussion of interrogation methods that may be more likely to lead to a false confession would improperly enhance Appellee's credibility and attack the officers' credibility. *Alicia, supra* (Stevens, P.J., dissenting, at 1–3).

The Commonwealth sought this Court's review, which we granted as to the following issue:

> Under this Court's precedent, which the Superior Court mischaracterized and misapplied, does expert testimony on "the phenomenon of false confessions" impermissibly invade the jury's exclusive role as the arbiter of credibility?

*Commonwealth v. Alicia,* 615 Pa. 613, 44 A.3d 1147 (2012).

To support its argument that Dr. Leo's proffered testimony would improperly intrude on the jury's exclusive role as the arbiter of credibility, the Commonwealth relies upon this Court's prior holding that similar psychological expert testimony in other areas is inadmissible because it would "invest the opinions of experts with an unwarranted appearance of authority on the subject of credibility, which is within the facility of the ordinary juror to assess." Commonwealth's Brief at 17–18 (citation omitted). In response, Appellee argues that Dr. Leo's testimony is admissible for the sole purpose of educating the jury as to a topic about which it would be otherwise uninformed. Appellee's Brief at 15–18. Appellee's *Amici Curiae,* the Innocence Network and the Pennsylvania Innocence Project, argue that jurors have an incomplete and inaccurate understanding of interrogation techniques and confessions, and thus are in need of expert

information concerning false confessions. In *Amici's* view, rather than invading the jury's province of assessing credibility, Dr. Leo's testimony would "provide a framework, based on established, general [sic] accepted research or clinical evaluations of the suspect, for juries to consider in their weighing of confession evidence." Brief of *Amici Curiae* at 15–16.

The admissibility of evidence is within the sound discretion of the trial court, and this Court will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. *Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 623 (2010). An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. *Commonwealth v. Eichinger*, 591 Pa. 1, 915 A.2d 1122, 1140 (2007). To the extent that this case presents a question of law, our standard of review is *de novo*, and our scope is plenary.

Under our Rules of Evidence, expert testimony is permitted when the expert's scientific, technical, or other specialized knowledge is beyond that of the average layperson and will help the fact-finder to understand the evidence or determine a fact in issue. Pa.R.E. 702(a) and (b)[11]; *Commonwealth v. Lopez*, 578 Pa. 545, 854 A.2d 465, 470 (2004). We have consistently maintained that a lay jury is capable of

---

11. The entirety of Rule 702 is as follows:

**Rule 702. Testimony by Expert Witnesses**
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
(c) the expert's methodology is generally accepted in the relevant field.
Subsection(c) reflects Pennsylvania's adoption of the standard in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *See* Comment to Rule 702. In the instant case, there is no *Frye* issue before this Court.

determining whether a witness is lying, and thus expert testimony is not permissible as to the question of witness credibility. For example, in *Commonwealth v. Davis*, 518 Pa. 77, 541 A.2d 315, 317 (1988), we stated the following:

[T]he veracity of a particular witness is a question which must be answered in reliance on the ordinary experiences of life, common knowledge of the natural tendencies of human nature, and observations of the character and demeanor of the witness. As the phenomenon of lying is within the ordinary capacity of jurors to assess, the question of a witness's credibility is reserved exclusively for the jury.

*Id.; see also Commonwealth v. Balodis*, 560 Pa. 567, 747 A.2d 341, 345 (2000) ("A determination of whether or not a witness is telling the truth is a subject well within the ordinary knowledge and experience of the average juror."); *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30, 32 (1976) ("To permit psychological testimony for th[e] purpose [of determining the credibility of a witness] would be an invitation for the trier of fact to abdicate its responsibility to ascertain the facts relying upon the questionable premise that the expert is in a better position to make such a judgment.")

On many occasions, this Court has held inadmissible expert psychiatric or psychological testimony which, by providing a generalized explication of human behavior under certain particular circumstances, directly speaks to whether a witness is being truthful. For example, in *Commonwealth v. Dunkle*, 529 Pa. 168, 602 A.2d 830, 836–38 (1992), we held inadmissible expert testimony as to the reasons why child victims of sexual abuse often do not immediately report the abuse and often omit many details thereof. We concluded that the reasons for such behavior in a child are well within the range of common experience, knowledge, and understanding of a jury, and expert testimony on the matter would improperly infringe upon the jury's ability and responsibility to assess the credibility of the child witness; *see also Balodis, supra* at 345–46 (relying on the same reasoning to reject expert testimony similar to that at issue in *Dunkle* ). Similarly, in *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986), we held

inadmissible expert testimony that young children rarely lie about sexual abuse, reasoning that such testimony would opine on the veracity of an entire class of individuals, and thus would encroach on the province of the jury to assess the individual witness's credibility; *see also Davis, supra* at 316–17 (citing *Seese* in concluding that expert testimony as to the inability of young children to fantasize about sexual encounters was improper). In *Commonwealth v. Gallagher,* 519 Pa. 291, 547 A.2d 355 (1988), we held that expert testimony on rape trauma syndrome was improperly admitted at the appellant's trial. The expert in *Gallagher* had opined that the victim was suffering from rape trauma syndrome, and thus her positive, in-court identification of the appellant as her assailant was not incompatible with her inability to identify him shortly after the rape, which had occurred five years earlier. *Id.* at 358. We determined that the only purpose of the *Gallagher* expert testimony was to enhance the credibility of the victim, and we concluded that "[s]uch testimony would invest the opinions of experts with an unwarranted appearance of authority on the subject of credibility, which is within the facility of the ordinary juror to assess." *Id.*

In each of the above examples, the psychological or psychiatric expert testimony deemed inadmissible was proffered by the Commonwealth; however, we have also rejected expert testimony proffered by the defense when it infringes upon the jury's assessment of a witness's credibility. For example, in *Commonwealth v. Crawford,* 553 Pa. 195, 718 A.2d 768, 773 (1998), this Court upheld the trial court's exclusion of expert testimony on revived repressed memory because the reliability of revived repressed memory was not at issue in the case and the expert testimony was intended solely to attack a Commonwealth witness's credibility, a matter properly left to the jury. Based upon similar reasoning, in several cases, we have also held inadmissible expert testimony regarding factors that may influence the reliability of eyewitness identification. *See Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176, 1178, 1182 (1993) (upholding the trial court's refusal to admit the opinion testimony of a psychologist regarding the possible effects of

stress upon a victim/witness's ability to identify his assailant, whom the victim/witness knew from their previous partnership in dealing illegal drugs); *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 631 (1995) (upholding the trial court's refusal to allow a defense expert to testify generally about the reliability of eyewitness identification, reiterating that "[s]uch testimony would have given an unwarranted appearance of authority as to the subject of credibility, a subject which an ordinary juror can assess," and noting that the defendant-appellant had attacked the witnesses' credibility and pointed out the inconsistencies of their testimony during cross-examination and closing argument); *Commonwealth v. Abdul–Salaam*, 544 Pa. 514, 678 A.2d 342, 352 (1996) (relying on *Simmons* to uphold the trial court's denial of the appellant's request for funding of an expert in the psychology of eyewitness identification).[12, 13]

12. In *Commonwealth v. Walker*, 625 Pa. 450, 92 A.3d 766, 2014 WL 2208139 (Pa., filed 5/27/14), the appellant has asked us to limit the holdings of *Abdul–Salaam*, *Simmons*, and *Spence*, and to reconsider the bar to expert testimony concerning factors that may impair the accuracy of eyewitness identification. We note here that the accuracy of an eyewitness identification is a matter readily distinguishable from the veracity of a confession to a crime. In assessing the reliability of an eyewitness identification, the issue is generally not whether the victim or witness is telling the truth—the victim or witness is often entirely and honestly convinced, and convincing to the fact-finder, that he or she has correctly identified the true perpetrator. The issue is rather whether the witness's identification is indeed accurate.

13. Our Superior Court has approved of the admission of psychological expert testimony in two areas, to wit, battered person syndrome and post-traumatic stress syndrome, as probative of the defendant's state of mind as it relates to a theory of self-defense. *See Commonwealth v. Miller*, 430 Pa.Super. 297, 634 A.2d 614, 622 (1993) (*en banc*) (reasoning that expert testimony as to battered person syndrome was "not introduced to improperly bolster the credibility of the defendant, but rather, to aid the jury in evaluating the defendant's behavior and state of mind given the abusive environment which existed"); *Commonwealth v. Pitts*, 740 A.2d 726, 732–34 (Pa.Super.1999) (relying on *Miller's* reasoning to admit the expert testimony of a defense psychiatrist as to the diagnosis and symptoms of post-traumatic stress syndrome, because such testimony would explain how post-traumatic stress syndrome affected the reasonableness of the defendant's belief that at the time he shot the victim, he was in danger of death or serious bodily injury). The circumstances of *Miller* and *Pitts,* and the purposes

■ Although this Court has not previously ruled on the admissibility of expert testimony concerning false confessions, courts in other jurisdictions have done so. Many have held such testimony inadmissible. For example, in *United States v. Benally*, 541 F.3d 990, 993 (10th Cir.2008), the Tenth Circuit Court of Appeals upheld a district court's refusal to admit a psychologist's expert testimony concerning whether false confessions occur, and if they do occur, why they occur. The defendant-appellant had testified that his confession was false and claimed that it had been prompted by federal agents' coercive tactics. *Id.* In rejecting the defendant-appellant's proffered expert testimony, the Tenth Circuit held as follows:

> [The psychologist's expert] testimony inevitably would encroach upon the jury's vital and exclusive function to make credibility determinations. While [the defendant-appellant] emphasizes that [the psychologist expert] would not have opined as to whether she believed [that he had] confessed falsely, with or without the opinion, the import of her expert testimony would be the same: disregard the confession and credit the [defendant-appellant's] testimony that his confession was a lie. Testimony concerning credibility is often excluded because it usurps a critical function of the jury and because it is not helpful to the jury, which is capable of making its own determination regarding credibility.

*Id.* at 995 (internal quotation marks and citations omitted).

In *United States v. Jacques*, 784 F.Supp.2d 59, 60 (D.Mass. 2011), a district court declined to admit the defendant's proffered expert testimony concerning the existence of false confessions generally and the features of the defendant's specific interrogation that allegedly increased the risk of a false confession. Citing *Benally, supra*, the court concluded, *inter alia*, that the proffered expert testimony was contrary to the well-established rule that an expert cannot offer an opinion as to a criminal defendant's guilt or innocence: "An opinion that a defendant's [confession] is unreliable cannot be logically disconnected from the implicit opinion that the defendant is, in

for which psychological expert testimony was proffered in these cases, are distinguishable from the instant case.

fact, *not* guilty." *Jacques, supra* at 63 (emphasis in original).[14] *See also Brown v. Horell,* 644 F.3d 969, 978, 982–83 (9th Cir.2011) (in denying a petition for habeas corpus, upholding the exclusion of expert testimony as to interrogation methods that tend to produce false confessions, where the trial court had concluded that the defendant's explanation for his allegedly false confession, to wit, a threat of violence against another person, was within the jury's experience); *State v. Free,* 351 N.J.Super. 203, 798 A.2d 83, 95–96 (App.Div.2002) (holding that the trial court abused its discretion in admitting expert testimony as to false confessions and interrogation techniques because, *inter alia,* it was not scientifically reliable, it was of no assistance to the jury, and the jury would recognize that coercive methods have the potential for causing a false confession).

Appellee cites three cases in which expert testimony as to false confessions was determined to be admissible. *See* Appellee's Brief at 17–18 (citing *United States v. Hall,* 93 F.3d 1337 (7th Cir.1996); *Boyer v. State,* 825 So.2d 418 (Fla.Dist.Ct.App. 2002); and *Miller v. State,* 770 N.E.2d 763 (Ind.2002)). In *Hall,* the defendant-appellant's theory of the case was that he had falsely confessed due to a personality disorder that made him susceptible to suggestion and pathologically eager to please. *Id.* at 1341. The district court excluded expert testimony from a social psychologist regarding false confessions and coercive interrogation techniques, as well as expert testimony from a psychiatrist who had examined the defendant-appellant regarding his susceptibility to interrogation techniques and his propensity to give a false confession. *Id.* at 1341, 1345. The Seventh Circuit vacated the defendant-appellant's conviction, concluding that the excluded expert testimony at issue "went to the heart" of the defendant-appellant's defense.[15] *Id.* at 1345; *see also Boyer, supra* at

14. It must be noted that in *Jacques,* the defendant's confession was recorded on videotape, and thus the district court concluded that the jury "was particularly well positioned to evaluate for itself the effect of the interrogation technique on the reliability of [the defendant's] confession." *Id.* at 63.

15. The 7th Circuit remanded the case to the trial court to determine whether the expert was proposing to testify to scientific knowledge that

419–20 (in reversing the trial court's exclusion of expert testimony as to the phenomenon of false confessions and police interrogation techniques, quoting *Hall* for the proposition that the expert testimony "would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried"); *Miller, supra* at 774 (reversing the trial court's exclusion of expert testimony as to the psychology of false confessions because the testimony "would have assisted the jury regarding the psychology of relevant aspects of police interrogation and the interrogation of mentally retarded persons, topics outside common knowledge and experience").

After careful review of relevant opinions from courts of other jurisdictions, as well as our own precedent, we are not persuaded by the rationale of those courts that have admitted expert psychological/psychiatric testimony regarding the phenomenon of false confessions and police interrogation techniques. Rather, we conclude, in agreement with the Tenth Circuit Court's decision in *Benally, supra* at 995, that expert testimony such as the proposed testimony of Dr. Leo constitutes an impermissible invasion of the jury's role as the exclusive arbiter of credibility.

This conclusion is not altered by the fact that the trial court's order barred Dr. Leo from offering opinion testimony as to whether Appellee's particular confession was, in fact, false. General expert testimony that certain interrogation techniques have the potential to induce false confessions improperly invites the jury to determine that those particular interrogation techniques were used to elicit the confession in question, and hence to conclude that it should not be considered reliable. Accordingly, we cannot conclude that Dr. Leo's proposed testimony would merely serve a pedagogical function.

Furthermore, were the defense permitted to offer Dr. Leo's testimony concerning interrogation techniques that might lead

would assist the trier of fact to understand or determine a fact in issue, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Hall, supra* at 1341–42, 1346.

to false confessions, it is highly likely that the Commonwealth would seek to present rebuttal expert testimony that the same techniques elicit true confessions—and elicit true confessions in substantially greater numbers than false confessions. We cannot conclude that expert testimony as to such generalities would help the jury to understand the evidence presented or to determine a fact in issue, to wit, the veracity of Appellee's confession. Ultimately, we believe that the matter of whether Appellee's confession is false is best left to the jury's common sense and life experience, after proper development of relevant issues related to, *inter alia*, the particular circumstances surrounding the elicitation of his confession, using the traditional and time-honored techniques of cross-examination and argument.

Accordingly, we reverse the order of the Superior Court and remand the matter to the court of common pleas for further proceedings not inconsistent with this opinion.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Justice BAER joins the opinion.

Chief Justice CASTILLE files a concurring opinion and Justice EAKIN files a concurring opinion.

Justice SAYLOR files a dissenting opinion in which Justice TODD joins.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion with the exception of footnote 12, which distinguishes *Commonwealth v. Walker*, 625 Pa. 450, 92 A.3d 766, 2014 WL 2208139 (Pa.2014), which is decided in concert with this case. I wrote separately in dissent in *Walker*, and thus my core position requires no distinction of the two cases.

Justice EAKIN, concurring.

As does the Chief Justice, I join the majority with the exception of footnote 12, and find no need to distinguish my

position in *Commonwealth v. Walker*, 625 Pa. 450, 92 A.3d 766, 2014 WL 2208139 (Pa.2014), from the present case. As in that case, I find neither need nor salience in allowing opinion testimony about the assessment or valuation of ordinary evidence, which is the peculiar responsibility of the jury.

Justice SAYLOR, dissenting.

In *Commonwealth v. Walker*, 625 Pa. 450, 92 A.3d 766 (2014), this Court lifted the absolute prohibition against expert testimony concerning eyewitness identifications, investing judgment about the admissibility of such evidence within the sound discretion of trial judges. *Walker*, in my view, reflects an emerging reluctance to adhere reflexively to nineteenth-century conventions and axioms, amidst growing evidence produced by social and behavioral scientists (among others) that these may have been precipitous. In this regard, I believe *Walker* represents an exercise in judicial modesty. After *Walker*, no longer will we intone that jurors' life experience and common sense will necessarily guide them to the truth when the essential inquiry encompasses understanding the complex subjects of perception and memory. Rather, in appropriate cases—where the science is sound and the evidence is deemed probative and necessary—we will not inflexibly block litigants' attempts to educate jurors about matters we are learning may be further from the realm of everyday experience than our predecessors had envisioned.

My position in the present case tracks my vote in *Walker*. Here, I would abandon the restraint upon our trial courts against admitting expert testimony regarding human behavior in police interrogations based on the notion that such evidence is by nature an "impermissible invasion of the jury's role as the exclusive arbiter of credibility." Majority Opinion, at 446, 92 A.3d at 764.[1] Although I believe that it should be the

---

1. Parenthetically, I find the majority's treatment of the Tenth Circuit's decision in *United States v. Benally*, 541 F.3d 990 (10th Cir.2008), to be materially incomplete. In this regard, I observe that the *Benally* court did not overturn prior decisions allowing the admission of expert testimony when a defendant's identifiable medical disorder raises a question as to the reliability of his confession. *See id.* at 996. Accord-

unusual case in which such evidence would be admitted, ultimately, I find insufficient justification to support perpetuating the *per se* prohibition.

I realize there are costs associated with moving beyond holding that everyday experience and common sense alone are sufficient to effectuate justice in cases requiring crucial judgments relative to eyewitness testimony and the behavior of those subject to interrogation. As the Commonwealth observes, the strategic use of expert testimony in litigation invites a counter-presentation and may make the prosecution's task of establishing guilt beyond a reasonable doubt more difficult. Nevertheless, the alternative of blanket exclusion of relevant evidence based upon unanalyzed assumptions about juror capabilities, even as these assumptions are challenged by demonstrations of wrongful convictions and developing behavioral science, is no longer satisfactory from my viewpoint. *Cf. Corley v. United States*, 556 U.S. 303, 321, 129 S.Ct. 1558, 1570, 173 L.Ed.2d 443 (2009) (observing that "there is mounting empirical evidence that [police interrogations] can induce a frighteningly high percentage of people to confess to crimes they never committed" (citing Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post–DNA World*, 82 N.C.L.Rev. 891, 906–907 (2004))).

In my considered judgment, the better approach is to trust our trial judges to make fair and just decisions on admissibility of expert evidence, knowing full well that there will be inconsistencies which will need to be addressed by the appellate courts in the developing decisional law. In the choice among the many imperfect approaches available to us for effectuating justice within our existing adversary system, I have come to prefer options which do not depend upon underanalyzed and untested presumptions.

Justice TODD joins this dissenting opinion.

ingly, the *Benally* decision is more fact-dependent than the majority opinion conveys.