[J-21-2023] [OISR: Mundy, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## WESTERN DISTRICT

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 26 WAP 2022 |
| | : |
| Appellee | : Appeal from the Order of the |
| | : Superior Court entered June 28, |
| | : 2021 at No. 16 WDA 2020, affirming |
| v. | : the Judgment of Sentence of the |
| | : Court of Common Pleas of |
| | : Allegheny County entered |
| RICKEY MCGINNIS, | : December 4, 2019 at No. CP-02- |
| | : CR-0011014-2018. |
| Appellant | : |
| | : ARGUED: April 19, 2023 |

## OPINION IN SUPPORT OF REVERSAL

**JUSTICE WECHT**                                             **DECIDED: DECEMBER 1, 2023**

I support lifting the categorical prohibition on expert testimony informing the jury that certain forensic interviewing techniques have the potential to produce false memories of abuse in young children. While some of this Court's past decisions have suggested that such testimony "would infringe upon the jury's right to determine credibility,"[1] our more recent precedent, in particular *Commonwealth v. Walker*,[2] eschews this *per se* exclusionary approach. I agree with Justice Mundy's opinion in support of affirmance ("OISA") that the rationale of those earlier decisions should be abandoned in favor of a rule that allows trial courts to admit relevant expert testimony that is otherwise admissible under our Rules of Evidence.

---

[1]    *Commonwealth v. Dunkle*, 602 A.2d 830, 837 (Pa. 1992).

[2]    92 A.3d 766 (Pa. 2014).

But my agreement with Justice Mundy's OISA ends there. Justice Mundy would simply replace one misguided exclusionary rule with another by creating vague new prerequisites to admissibility. Justice Mundy would then retroactively impose this new admissibility standard on Rickey McGinnis, who had no reason to know that he would bear such a burden. Even if this proposed admissibility rule was justified and retroactive application was not blatantly unfair, Justice Mundy's OISA also ignores ample evidence suggesting the possibility of taint in this case.

Many of our sister courts have addressed the issue of false memories in suspected abuse victims. In 1985, a pediatric nurse took the temperature of a four-year-old child with a rectal thermometer and the child said, "this is what my teacher does to me at nap time at school."[3] The nurse reported the comment to the local authorities, and all children enrolled at the Wee Care Nursery School in Maplewood, New Jersey were questioned. Social workers and therapists collected testimony from fifty-one children, aged three to five. During the interviews, the children made horrifying accusations about their teacher, Margaret Michaels. They said that Michaels forced them to lick peanut butter from her genitals, that she penetrated their rectums and vaginas with knives, forks, and other objects, that she forced them to eat cakes made from human excrement, and that she made them play duck, duck, goose naked.

Somehow, Michaels' colleagues at the school never witnessed her engage in abusive behavior of any sort, let alone the disturbing acts that the children reported to interviewers. Michaels ultimately was charged, tried, and convicted of over one hundred sexual offenses and was sentenced to forty-seven years' imprisonment. After Michaels spent five years in custody, the New Jersey Supreme Court overturned her convictions, finding that "the interviews of the children were highly improper and utilized coercive and

_____

[3]     *State v. Michaels*, 642 A.2d 1372, 1374 (N.J. 1994).

unduly suggestive methods."[4]  The New Jersey court's decision provides essential background for understanding how an investigatory interview of a young child can be coercive or suggestive, even unintentionally, and thus shape the child's responses.  The court explained that:

> a fairly wide consensus exists among experts, scholars, and practitioners concerning improper [forensic interviewing] techniques.  They argue that among the factors that can undermine the neutrality of an interview and create undue suggestiveness are a lack of investigatory independence, the pursuit by the interviewer of a preconceived notion of what has happened to the child, the use of leading questions, and a lack of control for outside influences on the child's statements, such as previous conversations with parents or peers.
>
> The use of incessantly repeated questions also adds a manipulative element to an interview.  When a child is asked a question and gives an answer, and the question is immediately asked again, the child's normal reaction is to assume that the first answer was wrong or displeasing to the adult questioner.  The insidious effects of repeated questioning are even more pronounced when the questions themselves over time suggest information to the children.
>
> The explicit vilification or criticism of the person charged with wrongdoing is another factor that can induce a child to believe abuse has occurred.  Similarly, an interviewer's bias with respect to a suspected person's guilt or innocence can have a marked effect on the accuracy of a child's statements.  The transmission of suggestion can also be subtly communicated to children through more obvious factors such as the interviewer's tone of voice, mild threats, praise, cajoling, bribes and rewards, as well as resort to peer pressure.[5]

The court also noted that governmental and law enforcement agencies understand that improper interviewing techniques risk corrupting the memories of young children.  That's why law enforcement and other interested groups like the Center for the Prosecution of Child Abuse, the District Attorney's Association, and the American Prosecutor's Research Institute "have adopted standards for conducting interviews

---

4       *Id.* at 1380.

5       *Id.* at 1377 (citations omitted).

designed to overcome the dangers stemming from the improper interrogation of young children."[6] Those standards and guidelines generally indicate, among other things, that interviewers should: (1) remain neutral, open, and objective; (2) avoid leading questions; (3) never threaten a child or try to force a reluctant child to talk; and (4) refrain from telling a child what others, especially other children, have reported. Similarly, the New Jersey Governor's Task Force on Child Abuse and Neglect encourages interviewers to attempt to elicit the child's feelings about the alleged perpetrator, but states that interviewers should refrain from speaking negatively about the suspect. It also stresses that multiple interviews with various interviewers should be avoided.

A key takeaway from the New Jersey Supreme Court's decision in the Wee Care Nursery School case is that "a sufficient consensus exists within the academic, professional, and law enforcement communities, confirmed in varying degrees by courts, to warrant the conclusion that the use of coercive or highly suggestive interrogation techniques can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements and subsequent testimony concerning such events."[7] Yet, even as the potential perils associated with interviewing young children about suspected sexual abuse have become widely recognized, experts who could inform jurors about the limits of forensic interviewing have been exiled from Pennsylvania courtrooms. That's because of this Court's decision in *Commonwealth v. Dunkle*,[8] where we held that the Commonwealth could not introduce so-called "profile testimony," in which an expert seeks to explain to

---

[6] *Id.* at 1378.

[7] *Id.* at 1379.

[8] 602 A.2d 830 (Pa. 1992).

the jury that children who have been sexually abused might not recall certain details of their abuse, might omit other details, or might delay reporting the abuse.

The *Dunkle* Court believed that it "is well within the common knowledge of jurors" that children who are sexually assaulted may delay reporting their abuse or may not remember some details surrounding it.[9] The Court therefore reasoned that an "instruction to the jury that they should consider the reasons why the child did not come forward, including the age and circumstances of the child in the case, [is] sufficient to provide the jury with enough guidance" to assess the child's credibility.[10] The Court also remarked that, "[n]ot only is there no *need* for testimony about the reasons children may not come forward, but permitting it would infringe upon the jury's right to determine credibility."[11]

*Dunkle*, in my view, is a regrettable decision. The Court's insistence that the average juror brings to the deliberation room a broad understanding of how children of different ages and backgrounds might respond to sexual abuse was pure conjecture dressed up as legal reasoning. Just as unsound was the Court's alternative rationale that allowing expert testimony on victim responses to sexual violence would infringe upon the jury's credibility-determining function. The idea that expert testimony relating to credibility constitutes an invasion of the jury's province is a centuries-old notion that "is poorly defined, lacks a legitimate doctrinal basis, and should be abolished in its entirety[.]"[12]

---

[9]      *Id.* at 838.

[10]     *Id.* at 837.

[11]     *Id.* (emphasis in original).

[12]     Ric Simmons, *Conquering the Province of the Jury: Expert Testimony and the Professionalization of Fact-Finding*, 74 U. CIN. L. REV. 1013, 1015 (2006); *id.* at 1018-1023 (discussing the history of the "province-of-the-jury" prohibition, which "grew naturally out of" the rule that expert testimony is admissible only if: (1) "the expert possessed a specialized skill in a particular subject" and (2) "the expert's opinion could assist the jury"); *see* Anne Bowen Poulin, *Credibility: A Fair Subject for Expert Testimony?*, 59 FLA. L. REV. 991, 993 (2007) ("The common-law prohibition against expert testimony on credibility (continued...)

Courts have never applied the maxim universally, which is actually a good thing given that virtually all expert testimony can be framed as undermining the credibility of some opposing witness.

In his brief to this Court, McGinnis offers examples from cases that his counsel personally has tried where expert testimony has been introduced in an effort to convince the jury that the defendant is not credible. In one of McGinnis' examples, a defendant testified that he was out of the country when he was alleged to have murdered the victim.[13] To corroborate that alibi, the defendant introduced his stamped passport into evidence. In response, the Commonwealth called an expert who testified that the passport stamps were forged. But how was that passport expert not infringing upon the jury's right to determine credibility? In another case that McGinnis recounts, a defendant testified that his wife grabbed his firearm during a confrontation and shot herself with it, so the Commonwealth called a crime scene expert to testify that the physical evidence was inconsistent with the defendant's account.[14] No one would suggest that either the passport expert or the crime-scene expert should have been kept from the jury, yet the experts in these examples arguably "invade the jury's province" every bit as much as testimony about false memories would.

Although *Dunkle* was wrongly decided, the legislative fix to *Dunkle* hardly improved matters. In 2012, the General Assembly enacted 42 Pa.C.S. § 5920, which provides that expert testimony is admissible in a criminal case if it "will assist the trier of fact in

_____

should not continue to restrict the admissibility of evidence bearing on credibility. Instead, courts should set aside the maxim's broadly stated prohibition and should eliminate the overprotection of the jury's 'special province.'"); *see also Commonwealth v. Alicia*, 92 A.3d 753, 765 (Pa. 2014) (Saylor, J., dissenting) (suggesting that this Court's pre-*Walker* decisions "adhere[d] reflexively to nineteenth-century conventions and axioms").

[13] Brief for McGinnis at 45-46.

[14] *Id.* at 46-47.

understanding the dynamics of sexual violence or domestic violence, victim responses to sexual violence or domestic violence and the impact of sexual violence or domestic violence on victims during and after being assaulted."[15] This statute effectively abrogates *Dunkle*, at least for expert testimony that falls within the scope of Section 5920.

The problem is that the scope of Section 5920 is at best unclear. Some lower courts, including the Superior Court below in an unpublished decision, have held that Section 5920 does not apply to expert testimony about suggestibility or false memories in children, since the statute concerns only "victim responses to sexual violence" and "the impact of sexual violence or domestic violence on victims."[16] Others, including some judges on the panel below, would hold that expert testimony about false memories and suggestibility may be admissible under Section 5920.[17]

Though Justice Mudy's OISA purports to answer it anyway, the question of Section 5920's scope is not properly before this Court.[18] McGinnis does not include a statutory interpretation argument in his brief, nor did he in his petition for allowance of appeal. Instead, he argues that Dr. Bruce Chambers' false memories testimony was admissible

---

[15]     42 Pa.C.S. § 5920.

[16]     *Id.*; *see Commonwealth v. McGinnis*, ___ A.3d ___, 2021 WL 2652690, at *7 (Pa. Super. 2021) (holding that McGinnis' "proffer did not relate to 'the dynamics of sexual violence, victim responses to sexual violence[,] [or] the impact of sexual violence on victims during and after being assaulted[,]' and thus, does not fall within the purview of Section 5920").

[17]     *McGinnis*, 2021 WL 2652690, at *9 (Bowes, J., concurring) ("I am unwilling to foreclose the possibility that an expert may proffer testimony about interview techniques or therapy that would implicate victims' responses to sexual violence or its impact within the meaning of § 5920, without opining about the credibility of the witnesses."); *id.* at *11 (Colins, J., dissenting) (suggesting that Dr. Chambers' testimony was admissible under Section 5920).

[18]     Justice Mundy's OISA at 16 ("As Section 5920 is limited in scope to evidence concerning violence and victim responses thereto, it does not encompass the type of expert testimony proposed by [McGinnis] in this matter.").

in light of *Walker*, which in turn signals this Court's retreat from the exclusionary approach espoused in earlier cases like *Dunkle*.[19]

In *Walker*, we lifted the *per se* bar on expert testimony regarding eyewitness misidentification. We did this, as other state courts did around the same time, in the face of mounting evidence that judge-made rules shielding jurors from entire bodies of science were leading to wrongful convictions.[20] The *Walker* Court correctly abandoned the legal fiction that lay jurors already possess encyclopedic knowledge about complex subjects like human behavior and perception.[21] However, the Court did not fight the similarly flawed premise that expert testimony is inadmissible if it invades the province of the jury in making credibility determinations.

Instead, the *Walker* Court distinguished our unfortunate precedent and concluded that expert testimony on eyewitness misidentification in particular is not one of the forbidden, province-invading kinds of expert testimony. The Court reasoned that eyewitness misidentification testimony does not speak to whether a particular witness is credible; rather, it *teaches* the jurors to decide for themselves whether the witness is

---

[19] *See* Brief for McGinnis at 41 (arguing that "*Walker* answers the question presented").

[20] *See Walker*, 92 A.3d at 775 ("[I]n the past 15 years, numerous states, including Iowa, Kentucky, Tennessee, and Utah, which had previously utilized the absolute prohibition approach, have reversed themselves[.]"); *id.* at 780 ("[T]here is no doubt that wrongful conviction due to erroneous eyewitness identification continues to be a pressing concern for the legal system and society."); Brandon L. Garrett, *Judging Innocence*, 108 COLUM. L. REV. 55, 60 (2008) (noting that 79% of the first 200 prisoners exonerated by DNA testing were convicted based upon mistaken eyewitness testimony); *see also Alicia*, 92 A.3d at 766 (Saylor, J., dissenting) (arguing that the "blanket exclusion of relevant evidence based upon unanalyzed assumptions about juror capabilities, even as these assumptions are challenged by demonstrations of wrongful convictions and developing behavioral science, is no longer satisfactory").

[21] *Walker*, 92 A.3d at 789 ("[W]e are no longer willing to maintain a preclusive rule based on equating common knowledge among jurors with a developed understanding of the factors which potentially impact eyewitness testimony.").

credible.[22] This illusory distinction was problematic from its inception. Take for instance *Walker*'s companion case, *Commonwealth v. Alicia*,[23] in which we held incongruously with *Walker* that allowing expert testimony on the phenomenon of false confessions would "constitut[e] an impermissible invasion of the jury's role as the exclusive arbiter of credibility."[24]

The only firm conclusion that can be drawn from our precedent in this area is that this Court has needlessly complicated already complex criminal matters by creating (and then inconsistently applying) admissibility rules that arose from dusty "nineteenth-century conventions and axioms[.]"[25] Beginning in the late 1980s, this Court authored a series of decisions prohibiting juries from hearing relevant expert testimony on certain subjects.[26] Neither of the two justifications given for these holdings is persuasive. First, the idea that "jurors' life experience and common sense will necessarily guide them to the truth"[27] is

---

[22] *Id.* at 784 ("Expert testimony on relevant psychological factors which may impact eyewitness identification . . . does not directly speak to whether a particular witness was untrustworthy, or even unreliable, as the expert is not rendering an opinion on whether a specific witness is accurate in his or her identification. Rather, such testimony teaches— it provides jurors with education by which they assess for themselves the witness's credibility.").

[23] 92 A.3d 753 (Pa. 2014).

[24] *Id.* at 764.

[25] *Alicia*, 92 A.3d at 765 (Saylor, J., dissenting).

[26] *See Dunkle*, 602 A.2d at 837 ("Not only is there no *need* for testimony about the reasons children may not come forward, but permitting it would infringe upon the jury's right to determine credibility.") (emphasis in original); *Commonwealth v. Gallagher*, 547 A.2d 355, 359 (Pa. 1988) (holding that expert testimony regarding "rape trauma syndrome" is inadmissible because it would encroach upon the jury's prerogative); *Walker*, 92 A.3d at 780 ("While in Pennsylvania the admission of expert testimony is generally a matter left to the discretion of the trial court, our decisional law from the mid–1990s has repeatedly barred, without exception, the admission of expert testimony regarding eyewitness identification.").

[27] *Alicia*, 92 A.3d at 765 (Saylor, J., dissenting).

obviously farfetched when complex issues of psychology, memory, and perception are at issue. As a matter of fact, the reason why litigants seek to introduce expert testimony on topics like false confessions and false memories is precisely because the concepts are highly counterintuitive to lay jurors. Second, as I have explained already, the supposed rule that experts cannot give general opinion testimony that undercuts the credibility of a witness would, if we really believed it, bar virtually all expert testimony in criminal cases.

While *Walker* rejected some of *Dunkle*'s unsound reasoning, the decision did not go far enough. Post-*Walker*, these matters now proceed piecemeal, with this Court applying in each individual case what we have termed a "flexible framework" to determine whether we think jurors ought to hear about certain kinds of expertise.[28] These decisions are essentially arbitrary. Expert testimony about false confessions is inadmissible, expert testimony about eyewitness misidentification is not inadmissible, expert testimony about victim responses to sexual violence may or may not be inadmissible, and I suppose we will address other kinds of experts another day.[29] Indeed, Justice Mundy foreshadows that today's appeal is but "the latest expert-testimony dispute in the *Walker* line."[30]

---

[28] *Walker*, 92 A.3d at 791 ("A more flexible framework strikes a crucial balance in determining the admission of expert testimony, as well as between protecting a defendant's rights while enabling the Commonwealth to meet its responsibility of protection of the public.").

[29] *Id.* at 791 ("[I]n light of the magnitude of scientific understanding of eyewitness identification and marked developments in case law during the last 30 years, it is no longer advisable to ban the use of expert testimony to aid a jury in understanding eyewitness identification."); *Alicia*, 92 A.3d at 764 (holding that expert testimony regarding the phenomenon of false confessions "constitutes an impermissible invasion of the jury's role as the exclusive arbiter of credibility"); *Commonwealth v. Jones*, 240 A.3d 881, 896-97 (Pa. 2020) ("While some testimony on [victim responses to sexual assaults] may be prohibited for impermissibly invading the jury's province of determining credibility, we disagree that all testimony will. Whether or not this prohibition has been violated must instead be assessed on a case by case basis.").

[30] Justice Mundy's OISA at 15.

This ad-hoc approach is not only unprincipled, but also unnecessary, since our rules of evidence already allow trial courts to exclude expert testimony for many reasons, including when it is irrelevant, when it risks confusing or misleading the jury, when it is not based on generally accepted science, or when it concerns matters already understood by average laypersons.[31] The risk of haphazardness with *Walker*'s piecemeal approach can be seen here, where Justice Mundy's OISA would end the *per se* prohibition on expert testimony regarding false memories, only to then replace it with an entirely new admissibility standard under which:

> expert testimony concerning implanted or distorted memories of sexual abuse must, as a predicate to admissibility, be linked in some way to the actual evidence in the case concerning possible taint, such as the interviews and counseling the alleged child victim underwent that may have led to such distortions, or a third party's animosity toward the defendant that may have resulted in fabricated memories. It is insufficient to rely solely on the circumstance that the child was subject to interviews and counseling or that a third party harbored hostility toward the defendant. Something more must be present to suggest those occurrences could have had a distorting effect.[32]

Justice Mundy suggests that this admissibility test originates from *Walker*, but it plainly does not. *Walker* simply held that a defendant must explain on-the-record "precisely how the expert's testimony is *relevant* to the eyewitness identifications under consideration and how it will assist the jury in its evaluation."[33] *Walker* also said that this proffer must "establish the presence of factors" that the expert will testify about which are

---

[31] Pa.R.E. 402 ("Evidence that is not relevant is not admissible."); Pa.R.E. 403 ("The court may exclude relevant evidence if its probative value is outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."); Pa.R.E. 702(c) (providing that an expert witness' methodology must be "generally accepted in the relevant field"); Pa.R.E. 702(a) (stating that an expert may offer opinion testimony if his or her "scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson").

[32] Justice Mundy's OISA at 20.

[33] *Walker*, 92 A.3d at 792 (emphasis added).

"beyond the common understanding of laypersons."[34] Both of these requirements come directly from our Rules of Evidence, which state that testimony must be relevant and that any expert must have specialized knowledge "beyond that possessed by the average layperson[.]"[35] In other words, *Walker* does not exclude any testimony that Rules 401 and 702 would not also keep out.[36]

Dr. Chambers' expert testimony would be admissible under the *Walker* approach. McGinnis could, upon remand, make a proffer to the trial court detailing specifically which aspects of forensic interviewing and/or cognitive therapy Dr. Chambers would address in his testimony. As courts have recognized, some factors that can undermine the neutrality of a forensic interview include: "a lack of investigatory independence, the pursuit by the interviewer of a preconceived notion of what has happened to the child, the use of leading questions, and a lack of control for outside influences on the child's statements, such as previous conversations with parents or peers."[37] "[I]ncessantly repeated questions," the "explicit vilification or criticism of the person charged with wrongdoing," and the use of "multiple interviews with various interviewers" also risk distorting the memories of suspected abuse victims.[38] Surely these (and other) factors are beyond the common

---

[34]     Id.

[35]     Pa.R.E. 402 ("Evidence that is not relevant is not admissible."); Pa.R.E. 702 (stating that an expert may offer opinion testimony if, among other things, his or her "scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson").

[36]     *Walker*, 92 A.3d at 792 ("We now allow for the possibility that such expert testimony on the limited issue of eyewitness identification as raised in this appeal may be admissible, at the discretion of the trial court, and *assuming the expert is qualified, the proffered testimony relevant, and will assist the trier of fact.*") (emphasis added).

[37]     *Michaels*, 642 A.2d at 1377.

[38]     *Id.* at 1377-78.

understanding of laypersons and testimony about them therefore would comply with Rule 702 so long as the expert's methodology is generally accepted in the relevant field.

As for relevance, there is no question that expert testimony regarding specific factors that can undermine the reliability of a forensic interview would have been relevant at McGinnis' trial. Evidence is relevant so long as it has "any tendency to make a fact more or less probable than it would be without the evidence" and that fact "is of consequence in determining the action."[39] Here, J.M. was roughly five years old when the alleged abuse occurred and he underwent his first interview, exactly the age in which experts agree children may be suggestible.[40] J.M. sat for multiple interviews and underwent extensive therapy with numerous providers in between those interviews, increasing the potential for such distortions to occur.[41] During this extended period, which lasted years, outside influences on J.M.'s statements were left entirely uncontrolled.[42] It would not be a leap for jurors to suspect, for example, that J.M. might have had conversations about McGinnis with Mother, who ended her relationship with McGinnis on

---

[39]    Pa.R.E. 401.

[40]    Stephen J. Ceci & Richard D. Friedman, *The Suggestibility of Children: Scientific Research and Legal Implications*, 86 CORNELL L. REV. 33, 34 (2000) ("Within the mainstream scientific community, scholars agree that young children are more susceptible than older individuals to leading questions and pressures to conform to the expectations and desires of others."); *Michaels*, 642 A.2d at 1378 ("The debilitating impact of improper interrogation has even more pronounced effect among young children.").

[41]    *See Michaels*, 642 A.2d at 1378 (stating that "multiple interviews with various interviewers should be avoided"); *id.* at 1377 (discussing "[t]he insidious effects of repeated questioning").

[42]    *Id.* at 1377 (noting that "a lack of control for outside influences on the child's statements, such as previous conversations with parents or peers" can "undermine the neutrality of an interview and create undue suggestiveness").

bad terms.[43] The Commonwealth's case against McGinnis also rested entirely on J.M.'s recollection of the events, thus making the reliability of his memory particularly relevant.

Furthermore, and contrary to Justice Mundy's depiction, J.M.'s recollection of the events did evolve throughout the interview process. According to Mother, J.M. initially said that McGinnis "put a hole in" JM.'s "butt" and he stated that this happens "[a]ll day long."[44] Mother then took J.M. to the hospital, where medical professionals found no physical evidence of sexual abuse. J.M. underwent his first forensic interview at the Child Advocacy Center ("Center") in February 2013. Records from the Center reveal that J.M. "did not demonstrate an understanding of the rules [of the interview]," did not know his age or date of birth, and could provide little to no information about his activities at school or his likes and dislikes.[45] Regardless, J.M. did not allege sexual abuse of any kind in this first interview. He stated that McGinnis "cuss[es] too much," but he denied that McGinnis "bothers him in any other way" or "is mean in any other way."[46] Justice Mundy

---

[43] Justice Mundy suggests that J.M. did not have contact with McGinnis because "J.M. gained an understanding of what his father had done to him and thus transitioned from wanting to see [McGinnis] to not wanting to see him." Justice Mundy's OISA at 21 n.16. In fact, though, Mother prevented McGinnis from seeing J.M. beginning when the two broke up, many months before the allegation of abuse even arose. Notes of Testimony, 9/9/2019, at 254.

[44] *See* McGinnis' Brief in Support of Omnibus Pre-trial Motion, 4/22/2019, at 5 (R.R. at 29). At the time J.M. made this allegation, McGinnis and Mother were not on good terms, to say the least. Four months earlier, Mother had found a naked photo of a woman on McGinnis' cell phone and responded by ending their relationship and prohibiting McGinnis from having any contact with his son.

[45] *Id.*

[46] *Id.* J.M. went on to recount to the interviewer a (presumably make-believe) tale of McGinnis getting a "knife from the kitchen" and pushing it "on top of [J.M.'s] clothes." *Id.* J.M. stated that McGinnis "push[ed] hard and hard all day." *Id.* He said that this took place on multiple occasions, sometimes in his room, sometimes in McGinnis' room, and sometimes in the living room. According to J.M., Mother witnessed these incidents and stated: "You are gonna cut him in half." *Id.*

suggests that McGinnis was not charged after J.M.'s initial forensic interview because "it was determined J.M. was unable to provide testimony due to his young age."[47] But testimony of what? There was no allegation of sexual abuse at all in the first interview.

Following the first interview, J.M. underwent four hours of trauma therapy every week for approximately seven months before Mother contacted the Center and again claimed that J.M. was disclosing McGinnis' abuse. J.M. then underwent a second interview. This time he alleged that McGinnis "hurt his butt with his penis" on one occasion.[48] But J.M. also gave conflicting or nonresponsive answers to questions about where in McGinnis' house the abuse occurred, whether anyone else was home, whether it was hot or cold outside at the time, and whether he said anything to McGinnis in response to the abuse.[49] The interviewer's notes for this session also indicate that J.M. "did not demonstrate an ability to differentiate between real and not real" and that he "was not resistant to suggestibility."[50] Unsurprisingly, the police declined to file charges against McGinnis at that time.[51]

J.M. continued in trauma therapy and received counseling from numerous providers for another half decade before Mother contacted the Center and re-reported the

---

[47]   Justice Mundy's OISA at 2.

[48]   McGinnis' Brief in Support of Omnibus Pre-trial Motion, 4/22/2019, at 5 (R.R. at 29).

[49]   *Id.* ("[J.M.] reported that it was 'cold' outside and then stated that 'It was warm.'"); *id.* at 6 ("[J.M.] denied that he said anything to Father and then stated, 'I told him to stop.'").

[50]   *Id.* at 5.

[51]   At trial, the lead Allegheny County Police detective, Timothy Stetzer, testified that, while the second interview yielded something closer to an allegation of abuse, J.M. ultimately was not able to distinguish "between what's real and not real[.]" Notes of Testimony, 9/4/2019, at 181 ("We did have a little more disclosure than we had initially, but it was not a disclosure[.]" According to Stetzer, JM "did a little bit better recounting . . . but [he] still had a little bit [of] trouble with colors. The differences between what's real and not real, that was a big one that we ran into.").

sexual abuse allegation again in June 2018.[52] The Center then conducted a third interview in which J.M. stated that McGinnis had raped him. It was only after this third interview, more than half a decade after the initial allegation, that McGinnis was charged. Given J.M.'s age, lack of resistance to suggestibility, proximity to Mother, inconsistent statements, and long history of interviewing and treatment, Dr. Chambers' expert testimony was both highly relevant and "linked in some way to the actual evidence in the case[.]"[53] Had the jury been aware that some children around J.M.'s age who participate in forensic interviews can develop false memories of abuse, that obviously would "make a fact" (*i.e.*, the allegation of abuse) "more or less probable than it would be without the evidence[.]"[54] This is not even a close call.

Put simply, Justice Mundy's approach is not a mere relevance inquiry. Nor does it have any basis in *Walker*, Rule 401, or Rule 702. Under Justice Mundy's test, McGinnis would have been required to identify some "aspect of [J.M.'s] therapy or any other factual predicate suggesting J.M.'s cognitive processes were affected in a manner tending to plant, distort, or otherwise interfere with his memories."[55] Justice Mundy also suggests— in seemingly contradictory back-to-back sentences—that "a third party's animosity toward the defendant that may have resulted in fabricated memories" would suffice to meet this test, but the fact "that a third party harbored hostility toward the defendant" would not.[56]

---

[52]    J.M. received counseling from Glade Run between February 2013 and August 2013; from WJS Psychological Services between August 2013 and January 2015; from Mercy Behavioral Health between January 2015 and May 2016; and from Barber Behavioral Health Institute between May 2016 and August 2018.

[53]    Justice Mundy's OISA at 20.

[54]    Pa.R.E. 401.

[55]    Justice Mundy's OISA at 21.

[56]    *Id.* at 20.

The apparent idea is that only "proofs suggesting [that a third party's] animosity may have had an influence on the alleged victim's memories" will justify admissibility.[57] Setting aside the question of how one could ever make such a showing, Justice Mundy's clarification proves that her proposed admissibility standard is not a mere relevance inquiry, as we called for in *Walker*. Relevance does not require "proofs" of anything. Evidence is relevant so long as it has *any tendency at all* to make a fact of consequence more or less probable than it would be without the evidence.[58]

While a clear majority of this Court believes that expert testimony regarding false memories in suspected abuse victims should no longer be *per se* inadmissible, under Justice Mundy's approach, the admissibility of such evidence would remain highly restricted and subject to vague judge-made standards found nowhere in our Rules of Evidence. Defendants seeking to undermine the credibility of a sexual abuse allegation with expert testimony would have to meet this heightened standard, while the prosecution could seek to admit expert testimony bolstering the allegation under Section 5920, which contains none of Justice Mundy's made upadmissibility restrictions. In doing so, Justice

---

[57] Justice Mundy's OISA at 21 n.17.

[58] Pa.R.E. 401. Justice Mundy also seemingly misunderstands conditional relevance, which is implicated under Rule 104(b) when the relevance of some offered evidence depends upon the existence of some other additional fact or facts not yet established. In those circumstances, a trial court "may admit the proposed evidence on the condition that the proof be introduced later" during the trial. Pa.R.E. 104. Rest assured, my difference with Justice Mundy's OISA has nothing to do with conditional relevance. My objection is that Justice Mundy would morph what should be a mere relevance inquiry into a vague and unrecognizable standard. Under Justice Mundy's rubric, expert testimony explaining that outside influences such as parents and peers can undermine the reliability of a forensic interview is somehow *irrelevant* in a case where the victim resided with a parent who strongly disliked the defendant during key years in which the victim's memories of abuse evolved. *See* Justice Mundy's OISA at 20 ("Something more must be present to suggest those occurrences could have had a distorting effect."). That conclusion is plainly incorrect. It is bad law. Nothing in Rule 104(b) makes it any less so.

Mundy's approach would subject the prosecution and the defense to entirely different admissibility rules.

While I support overruling *Dunkle*-era decisions that unwisely rendered expert testimony on entire categories of science *per se* inadmissible, Justice Mundy's preferred path would achieve very little. Justice Mundy's OISA would simply create new, misguided admissibility rules to replace our old, misguided admissibility rules. The only real solution is for this Court to fully abandon the province-of-the-jury prohibition once and for all and return control over the presentation of expert testimony back to trial judges. If it is honestly the case that a particular expert's proposed testimony would be irrelevant or would concern matters known by average laypersons, then trial courts can exclude the testimony under our ordinary Rules of Evidence. Decisions that do not tackle the province-of-the-jury prohibition head on merely offer the mirage of progress.

Justices Donohue and Dougherty join this opinion in support of reversal.