IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 26 WAP 2022 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered June 28, |
| | : | 2021 at No. 16 WDA 2020, affirming |
| v. | : | the Judgment of Sentence of the |
| | : | Court of Common Pleas of |
| | : | Allegheny County entered |
| RICKEY MCGINNIS, | : | December 4, 2019 at No. CP-02- |
| | : | CR-0011014-2018. |
| Appellant | : | |
| | : | ARGUED: April 19, 2023 |

## OPINION IN SUPPORT OF AFFIRMANCE

**JUSTICE MUNDY**                                    **DECIDED: DECEMBER 1, 2023**

In this appeal by allowance, we consider the admissibility of expert testimony regarding the possible false or distorted memories of alleged child sexual-abuse victims.

The complainant, J.M., was born in June 2007 to Mother and her paramour, Appellant. Appellant and Mother began living separately in 2010. Thereafter, J.M. lived with Mother but visited Appellant at his home from time to time. Appellant would also see J.M. whenever Appellant visited Mother at her residence. In September 2012, all such visits ceased after Mother and Appellant permanently ended their relationship.

Four months later, in January 2013, J.M. disclosed to Mother that Appellant had sexually abused him. Mother took J.M. to the hospital. J.M. did not report the abuse at the hospital and a medical exam produced no evidence of abuse. Nevertheless, Mother was advised to make a report with the police. Mother did so and was told someone would

contact her for a forensic interview.[1] After the interview, it was determined J.M. was unable to provide testimony due to his young age.[2] Instead, he treated with therapists, who encouraged him to draw pictures if he was unable to express his thoughts verbally.

J.M. drew pictures which, though rudimentary, depicted Appellant sexually abusing him. J.M. continued to treat with therapists and draw pictures for several years. Eventually, when J.M. was eleven years old, he gave a forensic interview (his third) with a disclosure sufficient to qualify him as a witness and for charges to be brought against Appellant. Police obtained statements from J.M.'s therapists and collected the booklet of the drawings J.M. made during therapy. In August 2017, four years and seven months after J.M.'s first disclosure, Appellant was charged with rape of a child, involuntary deviate sexual intercourse with a child, incest of a minor, endangering the welfare of children, corruption of minors, and indecent exposure.[3]

---

[1] A police detective testified at trial that in child sexual assault cases, forensic interviews are used to evaluate whether a child accuser is qualified to testify at trial – meaning the child has an adequate fund of knowledge about the world and can distinguish between truth and imagination so as to articulate what occurred. The detective also noted that forensic interviews are administered outside the custodial parent's presence; conducted by a third party using non-leading questions; and observed by the police through a mirror in another room. Children ages three to four are rarely qualified; children ages five and six are difficult to qualify; as they get older they are more easily qualified. And where an allegation exists but the victim is unable to articulate the incident adequately, counseling is recommended to aid in a developmental progression to the point where the child is able to describe the underlying facts. See N.T., 9/19/19, at 177-80, 184, 189. The police testimony also indicated that, during a forensic interview in a child sexual-abuse case, officers do not directly question a complaining witness less than thirteen years old "so they can't be led in any direction." Id. at 193.

[2] J.M. also suffered from speech delays which led to him receiving early intervention services starting at about three years of age. See N.T., 9/19/19, at 217 (testimony of Mother); N.T., 9/20/19, at 303 (testimony of Appellant).

[3] See 18 Pa.C.S. §§ 3121(c), 3123(b), 4302(b)(1), 4304(a)(1), 6301(a)(1)(ii), 3127(a).

Appellant filed an omnibus pretrial motion, seeking to preclude J.M. from testifying. Appellant alleged, among other things, that J.M.'s memories had been tainted by Mother's hostility toward Appellant, combined with a protracted course of investigative interviews with detectives and counselors in which the counselors had allegedly influenced J.M.'s memories of what occurred when he was five years old. This request was denied.

Citing Section 5920 of the Judicial Code, the Commonwealth filed a notice of intent to offer the expert testimony of Jamie Mesar, M.S.W., concerning how children generally disclose sexual abuse. That provision states, in relevant part:

**(b) Qualification and use of experts.--**

(1) In a criminal proceeding [involving certain enumerated offenses], a witness may be qualified by the court as an expert if the witness has specialized knowledge beyond that possessed by the average layperson based on the witness's experience with, or specialized training or education in, criminal justice, behavioral sciences or victim services issues, related to sexual violence or domestic violence, *that will assist the trier of fact in understanding the dynamics of sexual violence or domestic violence, victim responses to sexual violence or domestic violence and the impact of sexual violence or domestic violence on victims during and after being assaulted.*

(2) If qualified as an expert, the witness may testify to facts and opinions regarding specific types of victim responses and victim behaviors.

(3) The witness's opinion regarding the credibility of any other witness, including the victim, shall not be admissible.

(4) A witness qualified by the court as an expert under this section may be called by the attorney for the Commonwealth or the defendant to provide the expert testimony.

42 Pa.C.S. § 5920(b) (emphasis added).[4]

---

[4] In *Commonwealth v. Olivio*, 127 A.3d 769 (Pa. 2015), this provision was upheld as a valid exercise of legislative power to enact a rule of evidence. The Court concluded the rule was "substantive rather than procedural as it permits both parties to present experts to testify to facts and opinions regarding specific types of victim responses and victim (continued...)

In response, Appellant filed a motion *in limine* to preclude Ms. Mesar's testimony. He also moved to proffer his own expert witness on false memories in children, cognitive psychologist Bruce Chambers, Ph.D. The common pleas court held a hearing on the motions at which Ms. Mesar testified. The court ultimately permitted the Commonwealth to call Ms. Mesar as an expert witness under Section 5920.

The court indicated, however, that Dr. Chambers' testimony could not be admitted absent a *Frye* hearing. *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) (holding novel scientific evidence based on a scientific technique is only admissible if the technique has gained general acceptance in the relevant scientific community). The court also expressed skepticism that Dr. Chambers' testimony fell within the scope of Section 5920. As well, the court requested decisional authority addressing the type of evidence Dr. Chambers would provide, his curriculum vitae, and information as to whether he had testified as an expert in this area in Pennsylvania or had been subject to a *Frye* hearing in the past. Defense counsel responded he "believed" Dr. Chambers had testified in other Pennsylvania judicial proceedings.

On August 5, 2019, Appellant sent the prosecution a letter from Dr. Chambers setting forth his curriculum vitae and indicating his testimony would include such matters as: the role of interview bias; the effects of repeated questioning; the tainting effects of suggestive interviewing; the role of suggestion in delayed recall of child sexual abuse; and the creation of false memories. Dr. Chambers added he would not testify about J.M. specifically, but about the topic of false memories generally. In his curriculum vitae, Dr. Chambers stated he had testified as an expert witness in hundreds of child sexual abuse cases in Pennsylvania. Although this was sent to the prosecution, the record does not

---

behaviors." *Id.* at 780 (internal quotation marks and citation omitted). Separately, unlike in *Commonwealth v. Dunn*, 300 A.3d 324 (Pa. 2023), there is no allegation in the present case that the Commonwealth's notice of its intent to present such evidence was untimely.

indicate it was filed with the court. Thereafter, on August 19, 2019, Appellant filed with the court a brief in support of the admissibility of Dr. Chambers' testimony.

The following day, August 20, 2019, the trial court issued an order rejecting the defense proffer and indicating the testimony did not fall within Section 5920 because it did not relate to the dynamics of sexual violence, victims' responses to such violence, or the impact of such violence. The court added Appellant had not provided the requested information, such as the curriculum vitae or an explanation of whether Dr. Chambers had been qualified as an expert in any area, and hence, it could not determine whether a *Frye* hearing was needed. Separately, the court stated Dr. Chambers' testimony would invade the province of the jury to determine credibility, and as such, was inadmissible on that basis per *Commonwealth v. Pugh*, 101 A.3d 820 (Pa. Super. 2014) (*en banc*), which concluded that "expert testimony regarding false confessions is impermissible as it provides no pedagogical purpose and interferes with the jury's exclusive duty to assess the credibility of witnesses." *Id.* at 821.[5]

One week later, on August 27, 2019, the court held an *in camera* hearing where J.M., now twelve years old, was questioned. Based on J.M.'s answers, the court found him competent to testify, and the matter proceeded to a jury trial.

At trial, the Commonwealth called Ms. Mesar as an expert in child sexual abuse pursuant to Section 5920. Her testimony was general rather than being connected with J.M.'s behavior specifically. She stated: there is no "normal" way children disclose sexual abuse, and instead, the disclosure process differs with each victim; with a very young

---

[5] Since *Pugh* dealt with false confessions, whereas Dr. Chambers' proposed testimony would have addressed false or distorted memories, the trial court evidently referenced *Pugh* for the broader prohibition on interfering with the jury's exclusive duty to judge credibility. *See Pugh*, 101 A.3d at 822-23 (citing *Commonwealth v. Delbridge*, 855 A.2d 27, 42 (Pa. 2003) ("[E]xpert testimony will not be permitted when it attempts in any way to reach the issue of credibility, and thereby usurp the function of the factfinder.")).

child, disclosure may be affected by the relationship between the abuser and the child and the abuser's closeness with or supervision of the child; there is likewise no "normal" way in which victims behave, as children react differently to mistreatment, trauma, and other events; and some children may never disclose sexual abuse. The drawings J.M. made in therapy were introduced. J.M. testified about them and stated his father "put his penis in my butt." The Commonwealth also presented the testimony of Mother, two police detectives, and the two therapists J.M. had treated with. Appellant testified in his defense, stating he did not rape J.M., nor did he engage in any sexual contact with him.

The jury convicted Appellant on all counts and the court sentenced him to 14½-to-29 years in prison. Appellant appealed to the Superior Court.

In compliance with a trial court order, Appellant filed a Rule 1925(b) concise statement, see Pa.R.A.P. 1925(b), in which he maintained, *inter alia*, that the trial court erred in (1) precluding Dr. Chambers' testimony to the effect that "certain 'responses and behaviors' may not be the result of actual sexual assaults," and (2) failing to allow Dr. Chambers to testify so as to discuss the "fallibility of 'therapy' that . . . resulted in the drawings/trauma narrative done by [J.M.] while in the care of [Mother]." In this latter issue, Appellant continued that "Dr. Chambers would have provided testimony as to the unreliability and/or suggestibility of the 'therapy' . . . that resulted in said drawings/trauma narrative." *Commonwealth v. McGinnis*, No. CP-02-CR-10014-2018, Concise Statement of Errors Complained of on Appeal, at 1-2 (C.P. Allegheny, filed Jan. 27, 2020).

The trial court issued a Rule 1925(a) opinion. The court noted it never received the information necessary to determine whether a *Frye* hearing was needed, such as whether Dr. Chambers had previously been qualified as an expert, and in what area, a curriculum vitae, or an expert report. *See Commonwealth v. McGinnis*, No. CP-02-CR-10014-2018, *slip op.* at 7-8 (C.P. Allegheny Feb. 24, 2020). It explained, as well, that

Appellant's proffer did not fall within the scope of Section 5920, as it did not relate to the "dynamics of sexual violence or domestic violence, victim responses to sexual violence or domestic violence and the impact of sexual violence or domestic violence on victims during and after being assaulted." *Id.* at 8 (quoting 42 Pa.C.S. § 5920(b)(1)). Finally, the court repeated its prior assertion that the testimony was inadmissible under *Pugh* insofar as it related to false memories and, as such, would be used exclusively to undermine the victim's credibility and thereby invade the province of the jury which is solely tasked with determining credibility. *See id.*

A divided three-judge panel of the Superior Court affirmed in an unpublished decision. *See Commonwealth v. McGinnis*, No. 16 WDA 2020, 258 A.3d 554, 2021 WL 2652690 (Pa. Super. June 28, 2021) (table). In the lead opinion, authored by Judge McCaffery, the court noted initially the admissibility of evidence lies within the trial court's discretion, and evidentiary rule 702 governs the admission of expert testimony – which is generally admissible if the witness holds specialized knowledge beyond that possessed by laypersons, such knowledge will help the trier of fact understand the evidence or determine a fact in issue, and the expert's methodology is generally accepted in the relevant field. *See id.* at *5 (quoting Pa.R.E. 702). Additionally, the court referred to the principle, expressed in *Pugh*, that expert testimony concerning a witness's credibility is prohibited. *See id.*

The court also acknowledged Appellant's arguments to the effect that: young children may be deferential to adults' beliefs and have particular difficulties identifying the sources of their beliefs; it can be challenging to elicit information from children without asking leading questions; there was no physical evidence of abuse; J.M.'s testimony occurred after years of therapy; his "anal sex narrative" was non-descript; Dr. Chambers' testimony would have leveled the playing field in light of the Commonwealth's expert

testimony admitted under Section 5920; and the testimony was admissible pursuant to *Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014), which held admission of expert testimony in the field of human memory, perception, and recall, for purposes of challenging eyewitness identification of a defendant, was not *per se* impermissible. *See McGinnis*, 2021 WL 2652690, at *6. The court rejected these arguments on the basis that the proposed testimony would not have related to the dynamics of sexual violence or victim responses thereto, but rather, to the tainting effects of suggestive interviewing techniques, the role of suggestion in delayed recall of child sexual abuse, the creation of false memories, and the like. As such, the court found that the testimony fell outside the scope of Section 5920. *See id.* at *7.

Further, the intermediate court indicated the trial court appropriately rejected Dr. Chambers' testimony on the basis that its sole use would have been to undermine J.M.'s credibility and, as such, would invade the jury's province. *See id.* (citing 42 Pa.C.S. § 5920(b)(3) (prohibiting expert testimony regarding the credibility of another witness); *Commonwealth v. Jones*, 240 A.3d 881, 896 (Pa. 2020) (same)). In this respect the court rejected Appellant's suggestion that Dr. Chambers' defense testimony would merely have been the mirror image of Ms. Mesar's testimony for the prosecution. It added that in view of its determination, it need not address whether the testimony was otherwise admissible per the trial court's discretion under *Walker*.

In terms of whether a *Frye* hearing was needed, the Superior Court recited that Appellant contended such a hearing was unnecessary because there was nothing novel about principles of cognitive psychology regarding false memories in children attained through manipulative, biased, or coercive interviews, as acknowledged in *Commonwealth v. Delbridge*, 855 A.2d 27 (Pa. 2003).[6] The court agreed that a *Frye* hearing was

---

[6] The *Delbridge* Court explained:
(continued...)

[J-21-2023] - 8

unnecessary, but for a different reason:  because, again, in its view Dr. Chambers' testimony would have been used exclusively to undermine J.M.'s credibility, an improper function for a trial witness. *See McGinnis*, 2021 WL 2652690, at *7.

Insofar as *Delbridge* indicates that taint relates to competency rather than credibility, and, as such, should be explored at a pretrial competency hearing, *see supra* note 6, the court noted Appellant argued no such hearing was necessary here because he wanted to use Dr. Chambers' "generic" false-memory testimony to cast doubt upon the credibility of the government's evidence, rather than impugn J.M.'s competency – and defendants have a constitutional right to challenge the credibility of the government's evidence. *See Crane v. Kentucky*, 476 U.S. 683, 690-91 (1983). The court found this claim waived as it was being asserted for the first time on appeal. *See McGinnis*, 2021 WL 2652690, at *8.[7]

Judge Bowes authored a memorandum concurring in the result on the basis that Dr. Chambers' expert report was insufficiently specific to apprise the trial court and the

---

Common experience informs us that children are, by their very essence, fanciful creatures who have difficulty distinguishing fantasy from reality; who when asked a question want to give the "right" answer, the answer that pleases the interrogator; who are subject to repeat ideas placed in their heads by others; and who have limited capacity for accurate memory.

*Id.* at 39-40. We found persuasive decisions by other state courts acknowledging the phenomenon of "taint," that is, that young children's memories can be corrupted by the way interviews and investigations are conducted. We determined the question of whether a child witness's memory of an event has been tainted may be examined during a pretrial competency determination. *See id.* at 40. We declined, however, to render an opinion on the acceptance of taint within the relevant scientific community. *See id.* at 39 n.12.

[7] In fact, in his brief in support of Dr. Chambers' testimony Appellant had included a claim that preclusion of such testimony would violate his Sixth and Fourteenth Amendment rights. However, he waived that claim by failing to repeat it in his Rule 1925(b) statement. *See Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998).

prosecution of the nature and substance of the opinion testimony he would give at trial, how it would relate to the topics within the scope of Section 5920, or how it would rebut the testimony of the Commonwealth's expert, Ms. Mesar. Thus, the concurrence agreed the trial court acted within its discretion. Judge Bowes declined, however, to join the lead opinion to the extent it suggested all expert false-memory testimony lies outside that statutory provision. *See id.* at \*9 (Bowes, J., concurring) ("I am unwilling to foreclose the possibility that an expert may proffer testimony about interview techniques or therapy that would implicate victims' responses to sexual violence or its impact within the meaning of § 5920, without opining about the credibility of the witnesses."). In this regard, Judge Bowes read *Delbridge* and other Pennsylvania precedent as suggesting such testimony is not the type of novel scientific evidence that would have to be tested in a *Frye* hearing, and that it could be admitted in an appropriate case if it stopped short of opining the prosecution witness was, in fact, tainted. *See id.* Finally, the concurrence rejected Appellant's contention he should have been allowed to present Dr. Chambers' testimony at trial to undermine J.M.'s credibility (as opposed to competency), on the basis that case law expressly forbids expert testimony proffered with that objective because it invades the jury's province. *See id.* at \*10 (citing, *inter alia, Jones,* 240 A.3d at 897; *Commonwealth v. Maconeghy,* 171 A.3d 707, 712 (Pa. 2017) (holding a medical expert's opinion that a child had been sexually abused based solely on the child's statements to that effect intruded into the jury's assessment of witness credibility)).

Senior Judge Colins dissented, noting that in *Jones,* as well as *Commonwealth v. Smith,* 206 A.3d 551 (Pa. Super. 2019), the courts held experts could testify under Section 5920 on such topics as whether it was common for child victims of sexual assault to have trouble remembering dates and details of ongoing abuse, and whether it was common for such victims to share details of abuse in piecemeal fashion and relate details differently

in separate accounts. Given this, together with the "broad-ranging" expert testimony given by Ms. Mesar in the present case concerning children who initially disclose but then recant or change their accounts of the abuse, the dissent concluded Section 5920 is "expansive." *McGinnis*, 2021 WL 2652690, at *11 (Colins, S.J., dissenting). The dissent did not discern any principled rationale to exclude Dr. Chambers' "proposed *generic* expert testimony to the effect that, as a result of repeated forensic interviews and psychotherapy sessions, some children mistakenly come to believe they are victims of sexual abuse." *Id.* (emphasis in original). Accordingly, the dissent would have vacated Appellant's judgment of sentence and remanded for a new trial at which Dr. Chambers would be permitted to testify.

We allowed further review on the question of whether "generic" false-memories expert testimony in a child sexual abuse prosecution, which the defendant is seeking to present solely to educate jurors about how legitimate and false/distorted memories are and can be created in children, is admissible at trial. *See Commonwealth v. McGinnis*, 279 A.3d 506 (Pa. 2022) (specifying, as well, that the issue accepted for review does not subsume any question of constitutional dimension).[8]

It has long been the rule that experts generally are not permitted to testify regarding a witness's credibility, as that would invade the jury's role as the sole arbiter of witness credibility. *See, e.g., Commonwealth v. Seese*, 517 A.2d 920, 922 (Pa. 1986).[9] Lay jurors

---

[8] In addition to the party briefs, two *amicus* briefs have been filed. The Innocence Network and the Pennsylvania Innocence Project, favoring Appellant, mainly urge this Court not to issue a *per se* rule that the type of evidence here at issue can never be admitted at trial. The Support Center for Child Advocates, the Women's Law Project, and related organizations favor the Commonwealth; they contend the science of false/distorted memories is flawed and should be subject to a *Frye* hearing, and forensic interviews are reliable. They urge this Court to, at most, allow expert testimony on a case-by-case basis.
[9] To help understand how judge-made rules which categorically exclude certain types of evidence interact with the Pennsylvania Rules of Evidence, the path to admissibility has (continued...)

have been assumed to understand from common sense and common experience the reasons a given witness may testify falsely, and whether a particular witness is telling the truth, *see Commonwealth v. Davis*, 541 A.2d 315, 317 (Pa. 1988); *Commonwealth v. Alicia*, 92 A.3d 753, 761-62 (Pa. 2014) (discussing cases); *cf. Commonwealth v. Dunkle*, 602 A.2d 830, 837 (Pa. 1992) (indicating the reasons a child victim of sexual assault might delay reporting are "within the range of common experience" and thus are understood by juries), *superseded by statute as recognized in Commonwealth v. Jones*, 240 A.3d 881 (Pa. 2020), particularly given the availability of cross examination. *See Commonwealth v. Simmons*, 662 A.2d 621, 631 (Pa. 1995). Courts have also expressed that expert testimony could invest the opinions of experts with an unwarranted appearance of authority on the subject of credibility, *see Commonwealth v. Gallagher*, 547 A.2d 355, 358 (Pa. 1988), and could lead to rebuttal expert testimony by the Commonwealth, which would only serve to confuse the jury. *See Commonwealth v. Alicia*, 92 A.3d 753, 764 (Pa. 2014) (plurality).

In recent years, however, the rule has been relaxed in some discrete contexts where credibility is viewed as having two parts: *veracity*, that is, whether the witness is being honest, and *reliability*, which addresses how a witness may incorrectly believe he

---

sometimes been compared to clearing hurdles. *See, e.g., State v. Reece*, 349 P.3d 712, 731 (Utah 2015) (noting evidence of prior bad acts "must clear several evidentiary hurdles before admission"). While the Pennsylvania Rules of Evidence set up these hurdles, *see, e.g.*, Pa.R.E. 403, a judicial decision that precludes evidence on a categorical basis, like *Commonwealth v. Davis*, 541 A.2d 315, 317 (Pa. 1988) (prohibiting expert testimony that child sex abuse victims lack the ability to fabricate sexual experiences), prevents the evidence from entering the race in the first place – as does a statute such as the Rape Shield Law, *see* 18 Pa.C.S. 3104(a), subject of course to constitutional limitations. *See Commonwealth v. Rogers*, 250 A.3d 1209, 1216 (Pa. 2021). An enactment such as Section 5920, or a court decision like *Walker*, lifts that prohibition for certain kinds of proofs, but it does not remove the hurdles otherwise established by the evidentiary rules such as the need for relevance and the requirement that an expert be qualified. *See Jones*, 240 A.3d at 891.

or she is telling the truth. *See Commonwealth v. Walker*, 92 A.3d 766, 779 (Pa. 2014) (explaining eyewitnesses may offer inaccurate, but honestly held, recollections when identifying a perpetrator). The jury alone decides veracity, *see Seese*, 517 A.2d at 922, whereas there is now some room to introduce expert testimony about reliability in certain situations. Such expert evidence serves a pedagogical purpose in that it tends to be generalized and aimed at assisting the jurors by instructing them on advances in the social, cognitive, and behavioral sciences, and it does not purport to evaluate any specific eyewitness testimony given at trial or comment on any witness's truthfulness. *Accord Walker*, 92 A.3d at 784; *see also id.* at 785 (observing that per Rule 702 an expert may testify in the form of an opinion or otherwise, and the "or otherwise" phraseology contemplates a possible educational function for such testimony).[10]

Thus, in *Walker* we recognized a valid purpose for expert testimony to educate jurors about phenomena that might impair the reliability of eyewitness identification. *See id.* at 792-93. These factors included the phenomenon of weapons focus; the reduced reliability of cross-racial identifications; decreased accuracy in relation to high-stress criminal events; the lack of a strong correlation between witness confidence and witness accuracy; and the "increased risk of mistaken identification when police investigators do not warn a witness, prior to viewing a photo array or line up, that the perpetrator may or may not be in the display." *Id.* at 773-74.[11] In the companion case of *Commonwealth v.*

---

[10] Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson; (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and (c) the expert's methodology is generally accepted in the relevant field."

[11] In *Commonwealth v. Thomas*, 215 A.3d 36 (Pa. 2019), we declined to extend *Walker* to a situation where there was other substantial evidence of guilt, as we understood *Walker* as mainly being concerned with situations where the Commonwealth's case largely or wholly rests on the identification of a single eyewitness. *See id.* at 49-50.

*Alicia*, 92 A.3d 753 (Pa. 2014), however, we disallowed expert testimony on police interrogation techniques and the resulting phenomenon of false confessions, as that would invade the province of the jury. Two Justices distinguished *Walker* on the basis that the proffered testimony in *Alicia* was designed to support the defense theory that the confession was a lie, and as such, to opine on the defendant's veracity at the time of the confession. *See id.* at 762 n.12 (McCaffery, J., joined by Baer, J.).

The *Alicia* Court noted there was no claim the supposedly false confession was of the "internalized" kind in which the suspect confesses to a crime under the belief he committed it although he has no memory of doing so – as opposed to the more common "compliant" category in which the suspect is psychologically pressured to lie, giving a false confession so as to end the interrogation and perhaps obtain lenient treatment. *See id.* at 758 & n.8. This left the door open for consideration of whether similar testimony might be admissible where the defense argued the confession was an internalized false confession – and more broadly to other types of expert testimony relating to witness reliability. *See id.* at 765 (Saylor, J., dissenting) (observing *Walker* reflected "an emerging reluctance to adhere reflexively to nineteenth-century conventions and axioms, amidst growing evidence produced by social and behavioral scientists (among others) that these may have been precipitous").

Six years later, in *Commonwealth v. Jones*, 240 A.3d 881 (Pa. 2020), we held a police detective could supply expert testimony under Section 5920, the provision at issue herein, concerning victim behavior in response to sexual abuse. That enactment superseded *Commonwealth v. Dunkle*, 602 A.2d 830 (Pa. 1992), which found reversible error where an expert witness was permitted to testify concerning child "sexual abuse syndrome," *i.e.*, typical behavior patterns of sexually abused children – including why

children might forget some details, omit details, or delay reporting.[12] Finally, by *per curiam* order in *Commonwealth v. Brown*, 262 A.3d 1258 (Pa. 2021) (table), we granted review to address whether the trial court erred in excluding expert testimony regarding "blood alcohol content and its effect upon memory and perception," *id.* at 1259, but we later dismissed the appeal as improvidently granted. *See Commonwealth v. Brown*, 274 A.3d 1240 (Pa. 2022) (Mem.).

The broader impact of *Walker* remains an open question, and the present controversy is the latest expert-testimony dispute in the *Walker* line. It involves whether general, educational expert testimony concerning the false or distorted memories of a child invades the jury's province, as well as the scope of Section 5920, *i.e.*, whether that statute should be read broadly, as posited by the dissent below, to include such testimony.

As for the scope of the statute, the issue is whether the Superior Court dissent was correct in stating that there is no "principled rationale" to exclude generic expert testimony along the lines of that proposed by Dr. Chambers. In our view, the principled rationale is that the statutory text does not refer to such evidence. Paragraphs (b)(1) and (2) are the substantive provisions describing what type of testimony may be admitted. Paragraph (b)(1) relates to testimony that can assist the trier of fact in "understanding the dynamics of sexual violence or domestic violence, victim responses to sexual violence or domestic violence and the impact of sexual violence or domestic violence on victims during and after being assaulted." 42 Pa.C.S. § 5920(b)(1). Paragraph (b)(2) states an expert qualified under Section 5920 may "testify to facts and opinions regarding specific types of victim responses and victim behaviors." *Id.* § 5920(b)(2). These provisions describe situations where there has in fact been sexual or domestic violence, not circumstances involving false memories of violence. Evidence regarding how a young victim's memory

---

[12] *Jones* also held that, because Section 5920 recognizes expertise is needed on this topic, lay opinion testimony on the subject is precluded. *See Jones*, 240 A.3d at 896.

might be tainted by suggestive or coercive interviewing or therapy techniques, moreover, relates to the impact of those techniques, not the impact of the violence. As Section 5920 is limited in scope to evidence concerning violence and victim responses thereto, it does not encompass the type of expert testimony proposed by Appellant in this matter. *Accord* Brief for Commonwealth at 29 ("The statute covers responses to sexual violence, not responses to any questioning that may happen after the fact.").[13]

The question becomes, then, whether such testimony is otherwise admissible. There are conflicting policy considerations that surround the introduction of evidence about the reliability of an account given by children in sexual assault prosecutions. One is that a person should not be able to escape justice by victimizing children too young to be effective eyewitnesses; thus, there is an important societal interest in permitting such children to give an account of the underlying conduct long after the date of the offense when they have become competent to testify. As illustrated by the present case, during that interval they will likely have undergone counseling and forensic interviews. Conversely, society has an interest in assuring that innocent defendants are not criminally punished due to the susceptibility of young children to suggestion. Along these lines, the New Jersey Supreme Court has observed that investigative interviews can be "fraught with the elements of untoward suggestiveness and the danger of unreliable evidentiary

---

[13] Contrary to the assertion of the Opinion in Support of Reversal (OISR), the scope of Section 5920 is properly before us. *See* OISR at 7. It was addressed by the Superior Court, and we accepted review on the issue of "[w]hether 'generic' false memories expert testimony in a child sexual abuse prosecution, which the defendant is presenting solely to educate jurors about how legitimate and false/distorted memories are and can be created in children, is admissible at trial?" *Commonwealth v. McGinnis*, 279 A.3d 506 (Pa. 2022) (*per curiam*). If Section 5920 encompasses such testimony, the answer to the question presented is yes; if not, the answer depends on whether such testimony is admissible pursuant to other legal rules. In our order we expressly limited out any issue of constitutional dimension, but we did not limit out issues of statutory dimension. Further, both parties have briefed the issue. *See* Brief for Appellant at 39; Brief for Appellee at 29.

results," *State v. Michaels*, 642 A.2d 1372, 1382 (N.J. 1994), and this Court has indicated that children are particularly subject to suggestion and they often wish to give the "right" answer to an interviewer. *See supra* note 6 (quoting *Delbridge*, 855 A.2d at 39-40).[14] Thus, as the Superior Court has succinctly stated:

> One [concern] is that [the Commonwealth] should not be denied justice because reliance necessarily must be placed upon the testimony of a child of tender years. But, on the other hand, experience has informed us that children are peculiarly susceptible to the world of make-believe and of suggestions. Care must be exercised to keep the balance true as between these conflicting claims.

*Commonwealth v. D.J.A.*, 800 A.2d 965, 970 (Pa. Super. 2002) (*en banc*). The tension reflected in these competing policy objectives is acute because it is widely recognized that the sexual abuse of children generally occurs where the only two witnesses are the perpetrator and the victim,[15] and physical proofs are often absent due to a reporting delay. Also, in child sexual assault prosecutions, the stakes are high for all concerned. *Accord Maconeghy*, 171 A.3d at 713.

In attempting to "keep the balance true," and upon careful review, we see no basis to set down a *per se* rule precluding expert child-memory-taint evidence in all cases.

---

[14] *See generally* MODERN SCIENTIFIC EVIDENCE: THE LAW & SCIENCE OF EXPERT TESTIMONY § 16:13 (relating to the suggestibility of child witnesses); *Proof of Reliability of Eyewitness and Earwitness Testimony*, 92 AM. JUR. PROOF OF FACTS 3d 379, at § 5 (relating to age and disability as witness factors, and expressing that, "[d]espite the courts' willingness to consider children's testimony, there is considerable evidence, both from scientific research and from court cases, that children can be lead [sic] into recalling events inaccurately or confabulating"); 2 LITIGATOR'S HANDBOOK OF FORENSIC MEDICINE § 10:30 (discussing the McMartin Preschool abuse case in California).

[15] *See, e.g., People v. Harlan*, 271 Cal. Rptr. 653, 660 (Cal. Ct. App. 1990); *Opinion of the Justices to the Senate*, 547 N.E.2d 8, 9 (Mass. 1989); *State v. J.C.E.*, 767 P.2d 309, 311 (Mont. 1988), *overruled in part on other grounds, State v. S.T.M.*, 75 P.3d 1257, 1263 (Mont. 2003); *Commonwealth v. Huertas*, 2020 WL 408887, at *12 n.1 (Pa. Super. Jan. 24, 2020); *State v. Hood*, 438 P.3d 54, 69 (Utah Ct. App. 2018).

*Accord, e.g., United States v. Rouse*, 111 F.3d 561, 571 (8th Cir. 1997); *Jenkins v. Commonwealth*, 308 S.W.3d 704, 711-13 (Ky. 2010); *State v. Sargent*, 738 A.2d 351, 354 (N.H. 1999); *Barlow v. State*, 507 S.E.2d 416, 417 (Ga. 1998); *State v. Wigg*, 889 A.2d 233, 241-42 (Vt. 2005). *But see State v. Gordius*, 544 A.2d 309, 311 (Me. 1988). Generally speaking, testimony is not inadmissible solely because it "allows the jury to draw inferences" about another witness's credibility, *Wigg*, 889 A.2d at 241, and *Walker* reflects that in some instances expert evidence describing factors that may undermine the reliability of a fact witness's memories may be admissible where the expert's knowledge is beyond the ken of the average layperson as required by evidentiary rule 702(a). There is no reason in logic to exclude the area of child susceptibility to false or distorted memories from the more general precept reflected in *Walker*, particularly as expert evidence on this topic can equip jurors with knowledge useful to their fact-finding role. So long as the question of the witness's honesty or veracity is reserved exclusively for the jury, and all other conditions for the admission of such evidence are satisfied, we would find there is no *per se* bar. These other conditions include that the evidence is relevant and is not otherwise excluded by the Pennsylvania Rules of Evidence. *See supra* note 9.

In this latter regard, the admissibility of expert testimony is, notably, subject to other prerequisites. Rule 702 indicates the expert's specialized knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue." Pa.R.E. 702(b); *see Maconeghy*, 171 A.3d at 712 (summarizing Rule 702's demands).[16] This dovetails with

---

[16] Rule 702's third requirement is that the expert's methodology be "generally accepted in the relevant field." Pa.R.E. 702(c); *see supra* note 10. As such, a subsidiary issue to the one framed for review is whether the evidence proffered by Appellant in this case, involving cognitive psychology, memory formation, and memory taint, requires a *Frye* hearing. *See Commonwealth v. Topa*, 369 A.2d 1277 (Pa. 1977) (adopting the *Frye* rule in Pennsylvania). In *Commonwealth v. Delbridge*, 859 A.2d 1254 (Pa. 2004) (opinion (continued...)

the more general precept that to be admissible, the evidence must be relevant, *see* Pa.R.E. 402, meaning it must tend to make a fact of consequence in the case more or less probable. *See* Pa.R.E. 401; *see also Walker*, 92 A.3d at 787 (restricting expert evidence concerning factors impacting upon the reliability of eyewitness testimony to cases where such evidence is relevant). In *Walker*, the Commonwealth's case relied almost exclusively on eyewitness testimony and, as this Court highlighted, such testimony was subject to the very factors the pertinent social science had flagged as leading to potential inaccuracies – including, *inter alia*, weapons focus, the reduced reliability of cross-racial identifications, and decreased accuracy in relation to high-stress criminal events. *See id.* at 791. We therefore determined such testimony was admissible at the discretion of the trial court assuming not only that the expert was qualified, but that the evidence was relevant and would assist the jury. *See id.* at 792. We explained that

> the defendant must make an on-the-record detailed proffer to the court, including *an explanation of precisely how the expert's testimony is relevant to the eyewitness identifications under consideration and how it will assist the jury in its evaluation.* The proof should establish the presence of factors (e.g., stress or differences in race, as between the eyewitness and the defendant) which may be shown to impair the accuracy of eyewitness

---

after remand), this Court deferred the question to a future case in which there is pretrial proof of taint so as to trigger the need for expert testimony at a competency hearing. *See id.* at 1260. The issue is complicated somewhat in the present matter because of the procedural history in the county court as summarized above. *See generally* Brief for Commonwealth at 20-23. Additionally, the Commonwealth posits that, even if child memory-taint science was once generally accepted, recent scholarly criticism has generated sufficient controversy over its continued validity that the science has gained revived novelty. *See* Brief at 18-19.

In light of our holding below relating to the predicate need for proof of taint, we need not resolve in this appeal whether an accepted area of science can reacquire novelty for Rule 702(c) purposes, or whether a *Frye* hearing is required for this particular type of evidence. Finally, and contrary to Appellant's argument, *see* Brief at 39-41, this is not the same area of science as how victims react to sexual violence – made admissible by 42 Pa.C.S. § 5920(b)(2).

identification in aspects which are (or to a degree which is) beyond the common understanding of laypersons.

*Id.* (emphasis added). This type of limitation, which helps filter out expert testimony that has little demonstrable relevance at trial and thus fails to comply with evidentiary rules 702(b) and 402, was also endorsed by this Court in *Delbridge* in the context of a pretrial taint hearing. After surveying decisions by other state courts, we observed that exploring taint in the pretrial setting should be allowed "in those cases where there is some evidence that improper interview techniques, suggestive questioning, vilification of the accused and interviewer bias may have influenced a child witness to such a degree that the proffered testimony may be irreparably compromised." *Delbridge*, 855 A.2d at 39.

Applying the above rationale in the present context, we would hold the proffered expert testimony concerning implanted or distorted memories of sexual abuse must, as a predicate to admissibility, be linked in some way to the actual evidence in the case concerning possible taint, such as the interviews and counseling the alleged child victim underwent that may have led to such distortions, or a third party's animosity toward the defendant that may have resulted in fabricated memories. It is insufficient to rely solely on the circumstance that the child was subject to interviews and counseling or that a third party harbored hostility toward the defendant. Something more must be present to suggest those occurrences could have had a distorting effect. *See* Pa.R.E. 104(b) (pertaining to relevance that depends on a fact); *cf. Jones*, 240 A.3d at 896-97 (courts must evaluate on a case-by-case basis whether expert testimony concerning victim responses to sexual assaults impermissibly invades the jury's province to determine witness credibility).[17]

---

[17] The OISR criticizes this as a "new admissibility standard" that we would unfairly apply to Appellant. OISR at 2, 11. As can be seen, however, we would apply the reasoning reflected in prior cases together with our long-established rules of evidence.

(continued...)

Here, there was no such showing. Several days before trial, the common pleas court held a pretrial motion conference in which the subject of Appellant's proposed expert testimony was discussed. The court began by expressing its view that, from what it had seen, J.M. never wavered concerning the disclosure he originally made at age five. The court continued that while J.M.'s failure to articulate the disclosure at that time sufficiently to be qualified as a witness and for charges to be brought would be explored at trial, there was no basis to think any unusual or experimental therapy was utilized, or any other basis

---

The OISR also complains of "piecemeal" and "*ad hoc*" decision making because we do not address the admissibility of other types of expert evidence unrelated to this case. *Id.* at 10-11. Any questions along those lines, however, have not been raised, briefed, or accepted for review.

Finally, our proposed ruling is not internally "contradictory" or otherwise lacking in clarity. *Id.* at 17. There is a material difference between testimony indicating only that one parent harbors animosity toward the other (a state of mind), and proofs suggesting an inference that such animosity may have had an influence on the alleged victim's memories.

In this respect, the OISR's blanket assertion that "[r]elevance does not require 'proofs' of anything," *id.*, is inconsistent with the recognized concept of conditional relevance, *see* 1 MCCORMICK ON EVID. § 53 (8th ed. & July 2022 update); *United States v. Tony*, 948 F.3d 1259, 1263 (10th Cir. 2020) ("The necessity of expert testimony involves the principle of conditional relevance. Under this principle, a district court may exclude evidence if the jury could not reasonably find the existence of a preliminary fact essential to make the evidence relevant."); *Kosmas v. State*, 560 A.2d 1137, 1144 (Md. 1989); *Reilly v. Reilly v. SEPTA*, 479 A.2d 973, 1001 (Pa. Super. 1984), and with Pa.R.E. 104(b) itself which, as noted, addresses relevance dependent upon whether a preliminary fact exists. As for when such evidence must be introduced, we would not foreclose that a trial court may admit expert testimony subject to later presentation of evidence of the preliminary fact, with the burden on the opposing party to move to strike if such proofs are not eventually adduced. *See* Pa.R.E. 104(b); *accord Huddleston v. United States*, 485 U.S. 681, 690 n.7 (1988) (quoting 21 C. Wright & K. Graham, FEDERAL PRACTICE & PROCEDURE § 5054 (1977)); *cf.* Edward J. Imwinkelreid, *Judge versus Jury: Who Should Decide Questions of Preliminary Facts Conditioning the Admissibility of Scientific Evidence*, 25 WM. & MARY L. REV. 577, 590-91 (1996) (proposing when two items of evidence are relevant only when the other exists, evidence of either may be forwarded first, conditioned on subsequent evidence of the other) (quoting Maine Rule of Evidence 104, Advisor's Note).

to conclude J.M.'s memories had been "refreshed" or tainted by the therapy he was given. N.T., 9/4/19, at 3. Defense counsel responded that Dr. Chambers was proposing to

> plac[e the] cognitive therapy that the child did undergo several years into a proper context to indicate, not necessarily that the disclosure could be false, but that certain criteria in terms of what should be done with cognitive therapy should be followed with everything in the proper context and get the same picture. Eventually, there was certain criteria that he would testify to, if the Court permitted.

*Id.* at 4. The difficulty with this proffer is that it was insufficient to indicate a connection to specific factors to be brought out at trial that might evince memory taint. It refers to the "cognitive therapy that [J.M.] did undergo," but does not focus attention on any aspect of that therapy or any other factual predicate suggesting J.M.'s cognitive processes were affected in a manner tending to plant, distort, or otherwise interfere with his memories.

We have also carefully reviewed the record of Appellant's trial. The evidence adduced in that proceeding indicates the police never directly interviewed J.M., but observed the forensic interviews conducted by others through a one-way mirror. The testimony given by the persons who conducted those interviews, or with whom J.M. treated, reflects that his story never changed throughout all the years he underwent counseling, and this is consistent with Mother's testimony as well. *See* N.T., 9/10/19, at 234 ("He has been saying the same thing since he has been five-years old.").[18] The drawings J.M. made as a means of communicating the abuse in question were consistent with those accounts and with the testimony J.M. himself provided at trial. J.M. made these drawings in 2013 when he was six years old. *See* N.T., 9/9/19, at 138 (trial testimony of J.M.'s therapist). Thus, the Commonwealth relied on J.M.'s testimony

---

[18] Mother related that through therapy, J.M. gained an understanding of what his father had done to him and thus transitioned from wanting to see Appellant to not wanting to see him. *See id.* at 274. However, this development does not suggest J.M.'s account of what had been done to him changed over time.

concerning the alleged abuse, as well as the drawings he made in its aftermath.[19] There is nothing in the trial record to suggest interviewer bias or to indicate the therapists were attempting to influence J.M.'s memories of what had occurred, or that their interactions may have had that effect. Furthermore, although Mother expressed some antipathy toward Appellant based on the way their relationship ended, therapy and forensic interviews occurred outside her presence and nothing in her testimony or that of anyone else indicated she instigated or shaped J.M.'s disclosures, including the drawings, at any point in time. On this record, therefore, we believe the required linkage to the other evidence in the case simply does not exist.

Accordingly, we would affirm the Superior Court's order.

Chief Justice Todd joins this opinion in support of affirmance.

---

[19] As for the OISR's suggestion the Commonwealth's case "rested entirely on J.M.'s recollection of the events," OISR at 14, we note the Commonwealth also elicited expert evidence that some children who have been sexually abused engage in regressive behavior, including bedwetting and urinating on themselves even after they have been toilet trained. *See* N.T., 9/9/19, at 65-66 (testimony of Jamie Mesar). This dovetailed with Mother's testimony that when J.M. was four years old he urinated on himself while standing with his clothes on, looking at Mother and refusing to speak – and then again after lying down that evening. When Mother went to change his clothing, she noticed redness between his buttocks. *See* N.T., 9/10/19, at 223-25, 261-63.